**In re Fenton N. SOLIZ, Debtor.**

**Salameh FARRAJ and Margit Farraj, Plaintiffs,**

**v.**

**Fenton N. SOLIZ, Defendant.**

**Bankruptcy No. 95 B 20857 (ASH).**
**Adv. No. 95–5149A.**

United States Bankruptcy Court,
S.D. New York.

Oct. 8, 1996.

Andrew Sayegh by Walter Schwartz, Yonkers, NY, for Plaintiffs.

Doonan & Graves by Kevin G. Graves, White Plains, NY, for Defendant/Debtor.

### DECISION DETERMINING ADVERSARY PROCEEDING

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

This is a proceeding to determine the dischargeability of an indebtedness pursuant to 11 U.S.C. § 523(a). The Court has jurisdic-

tion under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b). The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure made applicable in these proceedings by Bankruptcy Rule 7052. The case was tried March 14, 1996 without a jury.

Pursuant to a contract dated March 20, 1989, the plaintiffs sold to defendant a piece of real property. The contract was not introduced in evidence but certain aspects of it were placed in the record by counsel and by the witnesses and are not in dispute. The sale price for the property was $285,000. The sale was contingent upon the buyer, defendant-debtor Fenton Soliz, obtaining financing, both a first mortgage and a second mortgage. The amount of the first mortgage was $213,500. The amount of the second mortgage, a purchase money mortgage loan granted by plaintiffs to defendant, was $84,-000, making the total financing on the property $297,500, some $12,500 in excess of the purchase price. Thus, defendant not only acquired plaintiffs' property without payment of any cash, but obtained $12,500 cash from his mortgagees upon the closing.

The closing of the sale was held on May 1, 1989, and on that date documents were exchanged such that both loans were made and title to the property was passed to the defendant. The first mortgagee was Prudential Home Mortgage Corporation ("Prudential").

It is stipulated that plaintiffs instituted suit in Supreme Court, Westchester County and obtained a summary judgment on February 9, 1993, in the amount of $106,058 against defendant on the second mortgage. It is further stipulated that the defendant is presently indebted to plaintiffs in the approximate amount of $100,000 plus interest.

There was an unusually sharp dispute of facts in the testimony of the witnesses at the trial. Plaintiff Salameh Farraj, a pharmacist, testified that in a meeting either at the building or at his drugstore defendant handed him a document marked Plaintiffs' Exhibit 1 which is a form residential loan application of Prudential. The numbers filled in on this document appear in typewritten form or computer generated form as opposed to handwriting. The document is not signed. It bears the name of Fenton N. Soliz and the name and address of his employer, Wall Street Equity, in White Plains, which was his wholly-owned mortgage brokerage firm. It bears no signature on any page. It bears a typewritten date on the second but not the third page. The typewritten date is 3/24/89. Mr. Farraj testified that defendant handed him this document at a meeting in early March 1989 in the course of a discussion of the plaintiffs making a purchase money mortgage loan to defendant. Adverting in his questions to specific numbers in Plaintiffs' Exhibit 1, plaintiffs' attorney asked Mr. Farraj if he relied upon the integrity of those numbers, and Mr. Farraj testified that he did and that he would not have made or agreed to make a purchase money mortgage loan had he known that the figures were materially false.

In his testimony defendant was shown a document by his counsel which was marked Defendant's Exhibit A. Defendant's Exhibit A is a multi-page document paginated from page 5, missing page 6, through page 22 and then there is a final unpaginated page which defendant testified bears his signature and the handwritten date 3/20/89. Defendant's Exhibit A is entitled in the top left hand corner of the first page, which is paginated 5, "Pre–Qualification Worksheet". The top left hand corner of the second sheet, which is sheet 7, is headed "Application Questionnaire". It appears from the last sheet and some other sheets as well that this document is a Prudential document. It is a printed form which is completed as to the blanks entirely in handwriting. Defendant testified that certain of the handwriting was his and certain of the handwriting was that of an "underwriter" in his employ at Wall Street Equity, his own company. Defendant testified that sheet numbered 5 which contains a representation of current gross monthly income of $28,000 was prepared by the "underwriter"; that paragraph 39 on page 12 which also refers to the $28,000 monthly income figure was filled in by the "underwriter"; that page 19 was filled in by the "underwriter"; that a portion of page numbered 20 was filled in by the "underwriter" as well as a

portion of page 21, and that the remainder of the document was filled in by defendant himself. It is defendant's testimony that Defendant's Exhibit A was prepared by him on or about the date it bears on the last page, March 20, 1989. This, coincidentally, is the as of date of the parties' contract, which was signed first by defendant and subsequently by Mr. Farraj. Defendant testified that he then either faxed or sent by overnight courier Defendant's Exhibit A to Prudential and that Prudential took the figures from the handwritten Defendant's Exhibit A, keystroked them into its computer and computer generated Plaintiffs' Exhibit 1, which as I mentioned, is dated 3/24/89 on the second page, and that he, defendant, did not see Plaintiffs' Exhibit 1 until some date after March 24, possibly not until the closing date. In any event, he testified that he did sign a copy of Plaintiffs' Exhibit 1 and delivered it as a condition of the May 1, 1989 closing. I have endeavored during the proceedings today to trace the numbers that appear on Plaintiffs' Exhibit 1 to the numbers that appear on Defendant's Exhibit A and, while I haven't done a meticulous job, it does appear that the numbers on Plaintiffs' Exhibit 1 track the numbers on Defendant's Exhibit A.

It is the testimony of defendant that he never at any time gave any copy of Plaintiffs' Exhibit 1 to Mr. Farraj or anybody acting for Mr. Farraj until discovery proceedings in connection with the foreclosure action, at which time defendant asserts his counsel delivered or forwarded a copy of Plaintiffs' Exhibit 1 to plaintiffs' attorney in the foreclosure action. Thus, defendant asserts it is physically impossible for plaintiffs to have seen and relied upon Plaintiffs' Exhibit 1 in early March 1989 or any time prior to the date or the signing of the parties' contract of sale. It should be noted that Defendant's Exhibit A was not produced to defendant's own attorney nor to the plaintiffs or their attorneys until this very morning, the morning of the trial. The copy that has been marked in evidence bears a fax band of 3/14/96, 8:57 A.M., Wall Street Equity, and counsel advised that upon his receipt of the document this morning, defendant's counsel, Mr. Graves, immediately notified plaintiffs' counsel, Mr. Schwartz, and forwarded it to him or faxed to him a copy of the document. It was also brought out in the testimony that it is the practice of defendant and his business to destroy documents after the passage of three years' time. The document in question, Defendant's Exhibit A, needless to say was not referred to in the pretrial order and it is my conclusion that no satisfactory explanation has been provided either for its mysterious appearance on the date of trial or for the defendant's failure to produce the document either in discovery proceedings in this adversary proceeding or in the state court action. No account has been given as to the provenance of Defendant's Exhibit A, an entirely handwritten document prepared by more than one person. The identity of the other person or persons preparing the document was not or could not be furnished, and there is a sharp dispute between the parties as to the question of dates.

To summarize the contentions of the parties, it is the defendant's contention that the plaintiffs could not have seen and therefore did not and could not have relied upon Plaintiffs' Exhibit 1 when they contracted to sell the property and make an $84,000 second mortgage loan, because, says defendant, the document was not in existence, and Mr. Farraj's testimony as to his receipt of the document and his reliance upon it, therefore, cannot be credited. The plaintiffs have advanced alternate arguments, confronted at not the eve but the very day of trial, with a document that appears to confound the testimony of Mr. Farraj. One argument is that the Court is faced with an irreconcilable issue of credibility (which is so), and that weighing the credibility of the parties, the Court should find Mr. Farraj the more credible because of the concededly and grossly false statements which are contained in both Defendant's Exhibit A and Plaintiffs' Exhibit 1.

I shall review plaintiffs' contentions and the facts bearing upon the alleged misrepresentations at this point. Defendant's Exhibit A represents on sheet marked number 5 that defendant's monthly gross income is $28,000. The same representation appears in paragraph 39 on page 12. Plaintiffs' Exhibit 1 also recites monthly income of $28,-

000. Plaintiffs' Exhibits 2 and 3, the joint tax returns of defendant and his wife on Form 1040 for the years 1988 and 1989, evidence on line 7 of Exhibit 2 for 1988, Wages, Salaries, Tips, etc. in the amount of $49,560 and on line 7 of Exhibit 3 for 1989, in the sum of $52,732. It appears therefore that there is no dispute that in actual fact defendant's gross monthly income at or about the time that he signed Defendant's Exhibit A and also when he signed a different copy of Plaintiffs' Exhibit 1 was in the neighborhood of $4,000 a month or a little more, as opposed to $28,000. This is a material misrepresentation, and I so find. Page 2 of Plaintiffs' Exhibit 1 recites defendant's ownership of. a parcel of property known as 10 Winslow Road with a present market value of $685,000 and another parcel of property known as 1 Nutgrove Street with a present value of $460,000. The same figures, $685,000 and $460,000, appear in paragraph 53 on sheet number 22 of Defendant's Exhibit A in defendant's handwriting. It appears that defendant paid $345,000 for the property known as 10 Winslow Road, valued at $685,000 in Plaintiffs' Exhibit 1 and Defendant's Exhibit A, and he paid $252,000 for the property known as 1 Nutgrove Street, valued at $460,000 in the two Exhibits in question. My recollection of the record as to how long prior to March 1989 defendant purchased those two properties, while unclear, is that it was not more than perhaps two or three years. Defendant testified that he had no appraisal, no evaluation of any sort for the two pieces of property in question and no basis for the value described in the two Exhibits other than his impression of what they were then worth. Since the record does not contain any evidence as to what those properties were in fact worth or what a reasonable appraisal would have been at the time, there is no a basis for finding that those figures were false in a fraudulent sense. But it would certainly appear that they were irresponsibly optimistic given the numbers (a disparity by a factor of almost two in the case of each property) and the time frames in question. Plaintiffs' Exhibit 1 in the middle of the second page contains a representation that the net worth of defendant's business was $3,500,000. A similar representation appears at sheet number 18 of Defendant's Exhibit A which is in defendant's handwriting. In his deposition in this action, taken on October 31, 1995, page 35, defendant was asked the following question and gave the following answer beginning at line 19, "Question: Back in March 1989, what is your estimate as to the value of Wall Street Equities and your hundred percent stock ownership at that time? Answer: $50,000, maybe." In the statement of assets and liabilities portion of page 2 of Plaintiffs' Exhibit 1, it is represented that defendant had $63,000 in an account with Citibank and a similar representation appears in item 45 at sheet 15 of Defendant's Exhibit A in defendant's handwriting. It appears that this money was in this account for a very brief period of time and did not constitute funds of defendant. I conclude from the foregoing that defendant made material false representations in Plaintiffs' Exhibit 1 and Defendant's Exhibit A.

The question is, what is the significance, if any, of those false representations? I perceive two possible significances. One relates to the credibility issue with which I introduced the subject of the misrepresentations. I am confronted with one witness, Mr. Farraj, who has testified before me under oath that he received Plaintiffs' Exhibit 1 in early March or in any event within a time frame such that he relied upon it in agreeing to make and in making the second mortgage loan of $84,000. The other witness, defendant, producing this very morning a document, has presented testimony which, if true, would render the testimony given by Mr. Farraj not true. I find this a particularly difficult issue of credibility to resolve. On the one hand, the dates of Plaintiffs' Exhibit 1 and Defendant's Exhibit A, March 24 and March 20, respectively, and the explanation of the procedures and the manner in which these documents were prepared and created, the one in hand by defendant and his employee or employees and the other computer generated by Prudential, circumstantially and intuitively make sense. On the other hand, the extraordinary departures from fact evidenced in these two documents and the mysterious appearance of Defendant's Exhibit A on the very morning of trial, the failure

to explain its provenance all these years and the failure to produce the document in prior discovery, all weigh heavily on the other side of the credibility issue. I am inclined, albeit with misgivings, to conclude that the plaintiffs have not sustained by a preponderance of the evidence the factual proposition that Plaintiffs' Exhibit 1 was produced, and by produced I mean created, and handed Mr. Farraj by defendant in early March 1989.

However, that does not end the inquiry. The palpable and material falsity of Defendant's Exhibit A and Plaintiffs' Exhibit 1 are significant in another context, that is, with regard to plaintiffs' alternative argument in this case. That argument is in substance as follows as I understand it. The entire transaction between these parties, that is to say the sale and the purchase money second mortgage of $84,000, was predicated from everyone's point of view upon the defendant's obtaining the first mortgage loan from Prudential. But for the first mortgage financing, there would have been no transaction. Mr. Farraj testified that he relied not only on Plaintiffs' Exhibit 1 but also upon the approval and consummation of the first mortgage loan—in short, the approval by Prudential of the entire transaction. It is argued by the plaintiffs, in substance, that the element of reliance is satisfied by reason of the fact that the Prudential loan, upon which the entire transaction including the second mortgage loan was contingent, was obtained by means of false written statements, namely Defendant's Exhibit A and Plaintiffs' Exhibit 1.

Section 523(a)(2)(B) of Title 11 states:

(a) A discharge under [specified sections] of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

\* \* \* \* \* \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; . . . .

The precise question under section 523(a)(2)(B) seems to me, and you might make notes counsel, both counsel please, seems to me to arise under subsection (iii) of subsection (B), which reads, "on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied". All of the other subsections of (B) appear to me to be clearly fulfilled here. There was a "statement in writing", namely the two Exhibits, which were "materially false", "respecting the debtor's . . . financial condition" which "the debtor caused to be made or published with intent to deceive". I have no doubt that those elements are fulfilled, and I so find. It is subsection (iii) of subsection (B) as to which I do not know the answer. It has not been briefed and I am going to call upon the parties to brief the issue.

Now in addition to section 523(a)(2)(B), I will call the parties' attention to section 523(a)(2)(A), which refers to money or credit, etc. obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition". Based upon my findings that the plaintiffs have not sustained their burden by a preponderance of the evidence with respect to the question of whether Plaintiffs' Exhibit 1 was actually delivered to and relied upon by Mr. Farraj, the question remains whether or not the obtaining of the credits, the first and second mortgages in this case, by means of these two documents which were undoubtedly delivered to Prudential, falls within the ambit of section 523(a)(2)(A), and I call upon counsel, if so advised, to brief that issue.

I think it incumbent, in order to complete this decision insofar as it is a decision today by this Court, to add a further recitation and finding with respect to certain facts. It is my conclusion that Plaintiffs' Exhibit 1 and Defendant's Exhibit A, in addition to being materially false and misleading, were a mate-

rial causative factor in the approval of the first mortgage by Prudential. I base that on the testimony of the defendant to the effect that the monthly income representation was necessary under Freddie Mac regulations to be made at a level of $28,000 per month in order to support a first mortgage at the level requested given the debtor's other indebtedness. His testimony was, I believe, quite clear that the $28,000 figure would have been selected by his employee based upon a calculation of what the regulations would require as a monthly income to support the new indebtedness, the first mortgage indebtedness, about to be taken on by this debtor. In addition, my conclusion with respect to the materiality of these documents in procuring the first mortgage loan is based on the fact that these documents are Prudential's own forms. They are required by Prudential to be signed by a mortgage applicant and the Court cannot but conclude that the data and information called for by the first mortgagee is information that is material to the first mortgagee in making its credit decision.

With that, gentlemen, I cannot complete this opinion until I receive your briefs. I ask you to brief these two issues and any other issue that you may deem appropriate given what I have said. But these are the two legal issues that appear to me to be determinative, based upon the facts which I have found. Upon receipt of your briefs and my own legal research, I will complete my decision. I know that this is an unusual procedure, but in order to get cases decided it is important that I render decisions to the extent that I can while the facts are absolutely fresh in my mind.

**[The foregoing portion of the decision (which has been edited in minor degree by the Court) was dictated by the Court immediately upon conclusion of the trial on March 14, 1996. The balance of the decision, below, was prepared following receipt of supplemental briefs from counsel for the parties.]**

### Discussion

*Section 523(a)(2)(B)(iii)*

■ As previously noted, the requirements of subsections (i), (ii) and (iv) of sec-

tion 523(a)(2)(B) have been met in this case. Plaintiffs' Exhibit 1 and Defendant's Exhibit A each constituted a "Statement in Writing" which was (i) "materially false", (ii) "respecting the debtor's . . . financial condition", (iv) "that the debtor caused to be made or published with intent to deceive". The question is whether plaintiffs can satisfy subsection (iii) "on which the creditor to whom the debtor is liable . . . reasonably relied". The parties have cited no authority which would definitively resolve this issue in the present circumstances, where the creditors in question, the Farrajs, were induced to part with their property by means of a transaction predicated upon a gross fraud, without having actually seen the defendant's written statements which were used to perpetrate the fraud.

Lacking controlling precedent on the question, I conclude that section 523(a)(2)(B) is not applicable where the creditor-plaintiff had never seen and had no knowledge of the contents of the written statement in question. I reach this conclusion not upon the simplistic ground that a party who has not actually seen a fraud with his own eyes cannot be held to have "relied" to his detriment—the concept of reliance is but part of the element of causation, and causation (or reliance) may be established in appropriate circumstances where the party harmed by a fraud had no knowledge of the instrumentality of the fraud. Rather, my conclusion is based upon the statutory scheme evidenced by section 523(a)(2). Section 523(a)(2) provides generally for non-dischargeability of debts incurred by fraudulent means, and it is divided into two subsections. Subsection (A), discussed below, deals broadly with the subject of fraud "*other than* a statement respecting the debtor's or an insider's financial condition" (emphasis supplied). What was carved out of subsection (A) is covered precisely and in detail in subsection (B), which concerns very specifically the use of "a statement in writing". Since the statute deals with the general subject of fraudulent conduct in subsection (A), without the very specific elements delineated in subsection (B), there is no reason to construe the subparts of subsection (B) more broadly than their language would fairly sup-

port in order to cover circumstances which are already covered in the broader provisions of subsection (A).

I conclude that subsection (B) is properly invoked where the creditor either has actually seen or, in an unusual case, has been made privy to the specific contents of the "statement in writing" in question and can demonstrate that he did in fact reasonably rely upon the contents of the written statement in extending credit. The plaintiffs in this case can claim persuasively that there is a causal relationship between their loss and the fraudulent written statements given by the defendant to Prudential. But that claim is better addressed in the broader statutory context provided by subsection (A).

█ Section 523(a)(2)(A) excludes from discharge a credit obtained by "(A) false pretenses, a false representation, or actual fraud, other than a statement [within the scope of subsection (B) ]". The use of the disjunctive "or" evidences that Congress intended to deny a discharge under any one of the three types of mischief referred to. *In re Marc Leventhal (Colonial National Bank USA v. Leventhal)*, 194 B.R. 26, 28 (Bankr. S.D.N.Y.1996) ("Section 523(a)(2)(A) speaks of 'false pretenses, a false representation, or actual fraud', evidencing a statutory distinction among the three"). While it may be argued persuasively that a discharge should be denied under both the "false representation" and "actual fraud" language of subsection (A),[1] there can be no question that the defendant obtained the purchase money second mortgage from plaintiffs based upon "false pretenses". The concept of false pretenses has been broadly construed by the

courts. The term has been defined as "[u]sually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposefully create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor." *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr.D.Colo.1990), *aff'd in part, rev'd in part, Evans v. Dunston (In re Dunston)*, 146 B.R. 269 (D.Colo.1992). "False pretense do[es] not necessarily require overt misrepresentations. Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations for purposes of nondischargeability where circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor." *Peterson v. Bozzano (In re Bozzano)*, 173 B.R. 990, 993 (Bankr.M.D.N.C.1994); *Memorial Hospital v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr.N.D.Ill.1996); *Banner Oil Co. v. Bryson (In re Bryson)*, 187.B.R. 939, 959 (Bankr. N.D.Ill.1995) ("[false pretenses] is more like being dealt from the bottom of the deck than being mugged"). Failure to disclose material facts on which a transaction depends constitutes false pretenses within the statute. In *Bombardier Capital, Inc. v. Baietti (In re Baietti)*, 189 B.R. 549 (Bankr.D.Me.1995), debtor Baietti, who was in the business of selling boats, failed to disclose to his lender that a number of boats on his property, appearing as unsold inventory, had been sold. The creditor would routinely inspect Baietti's boatyard, since Baietti was required under the loan documents to immediately notify and pay the creditor a proportionate amount

---

1. Defendant represented to the plaintiffs both orally to Mr. Farraj and, apparently, in the parties' written agreement that the transaction was dependent upon first mortgage financing and that he would apply to a commercial lender for the first mortgage. Defendant's failure to disclose to the plaintiffs that he obtained the first mortgage by means of fraud and that he did not have the financial resources to buy the plaintiffs' property without recourse to fraud rendered defendant's statements to the plaintiffs false and misleading. Stated another way, implicit in defendant's statements to plaintiffs that the transaction was contingent on first mortgage financing and that he would obtain such financing from a commercial lender was a representation that he

would obtain such financing honestly and without resort to fraud. Our jurisprudence has recognized time and again the theory of implied representation. For example, courts have held that each time a debtor uses a credit card the debtor impliedly represents that he or she has the intention and, some but not all courts hold, the ability to repay the charges incurred. *In re Carrier*, 181 B.R. at 747; *FCC National Bank v. Sharp (In re Sharp)*, 144 B.R. 372, 374 (Bankr. S.D.Ohio 1992); *The May Co. v. Chech (In re Chech)*, 96 B.R. 781, 783 (Bankr.N.D.Ohio 1988); *Norwest Bank Des Moines, N.A. Card Services Division v. Stewart (In re Stewart)*, 91 B.R. 489, 494 (Bankr.S.D.Iowa 1988); *In re Buford*, 25 B.R. 477, 481 (Bankr.S.D.N.Y.1982).

upon sale of a boat. Baietti defended by arguing that he did not affirmatively misrepresent the fact that several boats on his property had been sold; rather, he was merely a "silent onlooker" while the creditor derived false information from inspecting the boatyard. The court held that the false impression created by Baietti's failure to disclose the sale of certain of the boats constituted false pretenses under section 523(a)(2)(A). In so doing, the court defined "false pretenses" as an "implied representations, or conduct intended to create or foster a false impression". 189 B.R. at 553, quoting *Citizens & Southern National Bank v. Thomas (In re Thomas)*, 12 B.R. 765, 767 n. 3 (Bankr.N.D.Ga.1981), quoting *Davison–Paxon Co. v. Caldwell*, 115 F.2d 189, 193 (5th Cir.1940), *cert. denied*, 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941).

▪ Under the facts in this case, this Court has no hesitation in concluding that defendant obtained the purchase money second mortgage financing from the plaintiffs by "false pretenses". Every element of the transaction between the parties—the conveyance of title to the property from plaintiffs to defendant and plaintiffs' extension of credit to defendant in the purchase money second mortgage—was expressly contingent upon defendant's obtaining first mortgage financing from a commercial lender. The transaction was permeated by fraud because the first mortgage upon which the entire transaction depended was obtained by fraud. Plaintiffs had a right to rely upon the integrity of the first mortgage which was the linchpin of the entire transaction. Defendant's conduct in this transaction constituted "false pretenses" by even the most stringent definition of that term.[2]

▪ Defendant's argument that the plaintiffs' claim based on section 523(a)(2)(A) is barred by the statute of limitations because it was not pleaded in the complaint must be rejected. Since all of the material facts which form the basis for nondischargeability are pleaded in the complaint, an invocation of

a different statute than that mentioned in the complaint does not constitute an amendment of the complaint. *See O'Neil v. Kelley Drye & Warren (In re Colonial Cheshire I Limited Partnership)*, 167 B.R. 748, 752 (Bankr. D.Conn.1994) ("[b]ecause 'federal pleading is by statement of claim, not by legal theory,' the trustee's motion to amend his complaint to state an additional theory of recovery based on the same facts cannot be viewed as prejudicing the defendant") (citing *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 600 (2d Cir.1991)). Even if the statutory change constitutes an amendment, the amendment relates back to the date of the original complaint under Bankruptcy Rule of Civil Procedure 7015 which incorporates Federal Rule of Civil Procedure 15(c)(2). *See CIT Group/Factoring Manufacturers Hanover, Inc. v. Srour (In re Srour)*, 138 B.R. 413, 418 (Bankr.S.D.N.Y.1992) ("[i]f the original complaint sufficiently indicates the factual situation out of which the claim arises, the amendment will relate back ... it is well settled that an amendment which does not allege additional or different facts will relate back under Rule 15(c) even if the amendment seeks relief based upon a new cause of action") (citations omitted); *Koppel v. Koppel (In re Koppel)*, 165 B.R. 376, 378 (Bankr.E.D.N.Y.1994) ("[a] court should grant a motion to amend a pleading, and allow the pleading to relate back to the date of the original pleading, where the amended pleading relates to the transaction, nature of events or occurrence detailed in the original pleading") (citations omitted).

Plaintiffs' counsel will prepare an order and judgment consistent with this decision.

---

2. Defendant's fraud was exacerbated by the fact that the total indebtedness secured by the property exceeded the purchase price (*i.e.*, the ostensible fair market value) of the property. Since

defendant borrowed more than the property was putatively worth, the plaintiffs were undersecured from the outset.