**In re Vladimir BAUMBLIT, Debtor.**

**Desert Palace, Inc. d/b/a Caesars Palace, Plaintiff,**

**v.**

**Vladimir Baumblit, Defendant.**

**Bankruptcy No. 96–15432–575.**

**Adversary No. 96–1636–575.**

United States Bankruptcy Court, E.D. New York.

Jan. 20, 1999.

---

Esbin & Brosnan, LLP, by Scott L. Esbin, New York City, for plaintiff.

Rosenberg, Musso & Weiner, LLP, by Bruce Weiner, Carlos J. Cuevas, Brooklyn, New York, for defendant.

### OPINION ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

LAURA TAYLOR SWAIN, Bankruptcy Judge.

### *INTRODUCTION*

Before the Court for decision are the cross motions for summary judgment of plaintiff

Desert Palace, Inc. d/b/a Caesars Palace ("Caesars" or "Plaintiff") and of defendant Vladimir Baumblit ("Baumblit" or "Defendant") the debtor in this Chapter 7 case. Baumblit filed a voluntary Chapter 7 petition on June 11, 1996. Caesars, which had issued Baumblit a credit line for use in its Las Vegas casino, commenced this adversary proceeding on September 13, 1996, seeking a determination that approximately $210,977 of gambling debt incurred prepetition by Baumblit, as well as the attorney's fees and costs incurred in connection with the collection of such debt, is nondischargeable.

Caesars' First Claim for Relief seeks to have the debt declared nondischargeable pursuant to 11 U.S.C. section 523(a)(2)(A). Caesars' Second and Third Claims for Relief seek to have the debt declared nondischargeable pursuant to 11 U.S.C. section 523(a)(6). Caesars' Fourth Claim for Relief seeks to have the debt declared nondischargeable pursuant to 28 U.S.C. section 1738 based upon a prior default judgment against Baumblit, rendered prepetition by the United States District Court for the District of Nevada in a diversity action in which Caesars sought collection of certain dishonored "credit instruments" and damages under Nevada law for each unpaid instrument. The Fifth Claim for Relief seeks to have Caesars' legal fees and costs declared nondischargeable pursuant to 11 U.S.C. sections 523(a)(2)(A) and (a)(6).

The Court heard argument on the parties' cross motions on April 8, 1998. For the reasons set forth below, Defendant's motion for summary judgment is granted to the extent the motion is directed to Caesars' contention that the gambling debt, attorneys' fees and costs are nondischargeable pursuant to 11 U.S.C. sections 523(a)(2)(A) and (6). In light of Caesars' concession at the hearing on these motions that its prayer for nondischargeability pursuant to 28 U.S.C. section 1738 was improperly interposed, Defendant's motion is granted with respect Caesars' Fourth Claim for Relief. Defendant's motion is also granted to the extent it seeks attorneys' fees and costs, and such fees and costs as sanctions, under 11 U.S.C. section 523(d) and Fed.R.Bankr.P. 9011 respectively. Caesars' motion for summary judgment is denied.

The Court has jurisdiction of this core proceeding under 28 U.S.C. sections 157(a), 157(b)(2)(I) and (O) and 1334(b) and the Order of Reference, dated August 28, 1986, of the United States District Court for the Eastern District of New York (Weinstein, C.J.). Venue is property laid in this district under 28 U.S.C. section 1409.

### BACKGROUND

The following facts are undisputed. Plaintiff is a hotel-casino maintaining a place of business at 3570 Las Vegas Boulevard South, Las Vegas, Nevada.

Baumblit was born in the USSR and there attained the equivalent of a seventh grade education. Baumblit immigrated to the United States in 1979 with his wife and became a United States citizen. In 1985, Defendant founded Baumblit & Son, a construction company that he dissolved in 1992 due to gambling problems. Later, in 1992, Baumblit and his wife formed Baumblit Construction Company ("BCC"). Defendant's wife is the president and sole shareholder of BCC. Baumblit was employed as the general manager of BCC during 1994 and 1995 and was responsible for the daily operations of the company, including supervising job sites, procuring materials, negotiating contracts, signing checks, and other miscellaneous duties.

Baumblit first began gambling in the early 1990's. Between 1994 and 1995 he gambled primarily in Atlantic City. Baumblit received credit lines with various Atlantic City casinos. He gambled regularly at the Trump Plaza Hotel and Casino in Atlantic City ("Trump Plaza"). Trump Plaza granted him a credit line which, between January 1, 1994 and August 17, 1995, was increased from $25,000 to $75,000. Baumblit utilized this credit line frequently and had a consistent repayment history. Baumblit regularly left his winnings at the Trump Plaza to cover any debts due to the casino. Trump Plaza provided Baumblit complimentary lodgings, food, drinks, and paid for a $15,000 birthday party. Baumblit also gambled at other Atlantic City casinos, including the Trump Taj Mahal, where his initial credit line of $75,000

was increased to $125,000, and the Showboat Casino, where he had a credit line of $75,000. In 1994 Baumblit also gambled at the Mirage Casino in Las Vegas, where he had an initial credit line of $40,000. Baumblit returned to the Mirage in 1995, at which time he was given a credit line of $100,000.

Baumblit understood that he would have to repay any borrowed funds lost and made arrangements with casinos to pay his debts. Baumblit enjoyed gambling, valued his reputation as a good player and wanted to ensure a good relationship with the casinos. Baumblit understood that, to maintain his relationship with the casinos, he would have to pay his gambling debts.

Baumblit used BCC funds to pay for his gambling losses. Baumblit's had unrestricted access to BCC funds as well as managerial control over BCC, and would instruct BCC's accountant to advance him "bonuses," without his wife's knowledge, in the event that he needed to pay a gambling debt. Baumblit declared all of the bonuses as income on his joint tax returns and paid income taxes on all of the bonuses received from BCC. The bonuses advanced to Baumblit in 1995 amounted to approximately $149,000. Baumblit advised all of the casinos with which he dealt to send all of their correspondence to his business address, as opposed to his residential address, in an effort to keep his gambling activities a secret from his wife. He advised the casinos that, as long as his wife was uninformed about his gambling activities, he would have access to BCC funds to cover gambling shortfalls.

In July 1995 Baumblit misappropriated $209,000 that his wife had deposited into the couple's joint account from the sale of her partnership interest in certain real property. Baumblit transferred the money from the joint account into his individual account and used the funds to secure a line of credit from Republic National Bank to pay for his gambling losses.

In 1995, Mr. Gary DiBart, an executive with Caesars Boardwalk Regency in Atlantic City ("CBR"), visited Baumblit at Baumblit's New York office in order to solicit Baumblit as a customer for CBR. CBR is a corporate affiliate of Caesars. At the time DiBart solicited Baumblit as a customer, Baumblit had a reputation for being a high roller, a good casino customer and for paying his gambling debts. CBR provided Baumblit with complimentary tickets to a Ray Charles concert, food, beverages and a Cartier watch for his wife. CBR granted Baumblit a $100,000 credit line. Baumblit gambled at CBR and made payments to CBR when he incurred gambling losses. In 1995, Baumblit exhausted the entire CBR credit line and repaid it within thirty days.

DiBart arranged for Baumblit to visit Caesars on August 17, 1995. In order for DiBart to refer a customer from CBR to Caesars the customer had to be in good standing—i.e., one who had been paying his debts to the casino. DiBart transmitted Baumblit's CBR credit information to Mr. Thomas Bonanne, who was then the Director of Marketing for Caesars Palace and was one of the officers responsible for establishing Baumblit's credit line with Caesars. DiBart testified at his deposition in this matter that, in the course of transmitting Baumblit's credit information, he advised Bonanne that Baumblit had an outstanding debt to CBR of approximately $100,000. DiBart further testified that generally it would not be his practice to grant credit on top of credit and that, had the decision whether to extend Caesars credit been his to make, he would not have granted Baumblit additional credit at a time when Baumblit had an outstanding debt to CBR.

Caesars paid for Baumblit's airfare to Las Vegas, food, beverages, accommodations and for four tickets to the Tyson–McNeely prize fight. Upon arriving at Caesars, Baumblit completed and signed a credit application (the "Credit Application"). The Credit Application called for the applicant to provide certain information, specifically, his driver license number, social security number, date of birth, home address, home phone number, employer, employer's address, type of business, position within the business, business phone number, title, number of years employed, amount of credit requested, banks, banks' addressers and bank account numbers. A handwritten notation on the completed Credit Application indicates "NO

MAIL" in the space provided for the applicant's mailing address. Another handwritten notation, in the space provided for the applicant's job title, indicates "Pres.". The Credit Application was signed by Baumblit and a cashier and dated August 17, 1998.

Baumblit did not make any *express* representations, either orally or in writing, concerning his ability to repay, his intent to repay, or his financial condition at the time he signed the Credit Application. Indeed, the Credit Application signed by Baumblit did not request information regarding current bank account balances or a statement that the funds deposited in the listed bank accounts would be sufficient to cover the credit extended. Baumblit simply provided the numbers of two bank accounts maintained at the Republic National Bank. Each of the Caesars officers responsible for granting Baumblit credit [1] acknowledged at deposition that he could not recall any specific oral representations made by Baumblit concerning his intent to repay, ability to repay, his wealth or financial condition. Caesars claims, nonetheless, that the executed Credit Application constituted Baumblit's representation as to his intent to repay.[2]

Caesars initially granted Baumblit a credit line of $100,000, which was increased to $200,000 during the course of his visit. The amount of credit extended to Baumblit was based upon Baumblit's credit history as supplied by CBR. Such information included personal history regarding Baumblit's credit lines at CBR and at other casinos, his play history at CBR and at other casinos, his

average bet and his payment history at CBR and at other casinos. Absent Baumblit's payment history at CBR, he would not have received a credit line from Caesars.

As a general policy, Caesars would verify with a customer's bank that there were sufficient funds in the customer's account to cover the credit requested. However, the fact that there might not be sufficient funds in the account would not necessarily be determinative as to whether an extension of credit would be authorized. Other factors, such as the customer's history at other casinos, might weigh in favor of extending credit notwithstanding the absence of sufficient money in the bank.

Caesars has proffered no evidence, however, that it made any inquiry into the extent of funds present in the bank accounts Baumblit identified on his Credit Application. Baumblit was not asked to provide his account balances and there has been no proof offered that Caesars verified Baumblit's account balances with Baumblit's bank.[3]

Caesars' determination with respect to the amount of credit to extend to Baumblit was based solely on his good customer history at other casinos as provided to Caesars by CBR. Caesars has proffered no evidence to indicate otherwise.[4]

In order to draw on the credit line at Caesars, Baumblit was required to sign credit instruments or markers ("Markers"). Between August 17, 1995 and August 21, 1995, he signed twelve (12) Markers totaling $202,-

---

1. Thomas Bonanne, Chris Barnbeck, and William Knerr.

2. See, *e.g.*, the deposition testimony of Mr. Tom Bonanne:
 Q. [D]id Mr. Baumblit make any representations to you concerning his intention to repay Caesars Palace?
 A. Well, it is a given when they signed the credit application.
 Q. Did he make any verbal statements to you, sir? ...
 A. I don't recall.
 Q. Did he make any written statements to you concerning his intend [sic] to repay?
 A. Just the credit application.

3. Mr. William Knerr, the officer at Caesars who approved Baumblit's credit line, testified as to Caesars' general procedures regarding exten-

sions of credit. Knerr testified that credit was extended even though Baumblit did not supply banking information. Knerr also testified that, while bank verification is performed as a general matter, it would have been possible for Baumblit to obtain credit without investigation into his bank accounts.

4. Knerr testified that credit was extended based upon the customer information received by DiBart of CBR, as transmitted orally over the telephone. Knerr testified that the decision to extend credit, "was based on the quality of [Baumblit's] play. A very high dollar amount of play in Atlantic City. As I mentioned, sometimes there are intangible things that we measure. Not everybody keeps their money in a bank."

264 in exchange for the same amount of gaming chips. Upon exhausting the first $100,000 of credit, he requested and signed Markers for an additional $50,000; when that was exhausted he requested and signed Markers for a final $50,000 in credit. Upon exhausting approximately $200,000 in credit, he advised Caesars that he did not wish them to extend any additional credit.

At the time Baumblit signed the Markers, he believed that he was signing promissory notes. No one at Caesars informed Baumblit that the markers were in fact negotiable instruments that could be deposited against his bank account.[5]

The undisputed evidence indicates that Baumblit intended to repay his gambling debt to Caesars with BCC funds. At the time he signed the Markers, Baumblit had access to BCC funds sufficient to repay whatever indebtedness he incurred at Caesars. Baumblit testified that the fact that he had insufficient funds in his bank account to cover the Markers was immaterial in his mind because he was relying upon BCC funds to cover any shortfalls. Historically, he had utilized BCC funds, without his wife's permission, to cover his gambling losses. In order to ensure his continued access to BCC funds he directed Caesars, upon signing the Credit Application, not to send any correspondence to his home address so that his wife would remain uninformed about his gambling. He informed Caesars that in the event his wife learned about his gambling, she would terminate his access to BCC funds, impairing his ability to repay Caesars. The handwritten notation on the Credit Application in the space provided for the applicant's mailing address indicating "NO MAIL" corroborates Baumblit's undisputed deposition testimony on this point. At oral argument on these motions, counsel for Caesars conceded that Baumblit had access to BCC funds and had intended to repay his gambling debt to Caesars with misappropriated BCC funds.

While at Caesars, Baumblit won $72,000, which he paid over to Caesars to satisfy a portion of his debt. However, by the end of his stay, Baumblit's total losses were approximately $200,000. After he departed, Baumblit attempted to negotiate a repayment

---

5. Baumblit testified that he did not understand, at the time he signed the Markers, that Caesars could present the Markers to Baumblit's bank for payment. Baumblit testified that, during the eighteen months preceding his trip to Caesars, he had signed numerous similar markers at other casinos which he also believed to simply be evidence of debt. Baumblit further testified that, in the past, no casino had ever attempted to deposit a marker against his account.

In its papers, Caesars disputes Baumblit's testimony regarding his misapprehension of the nature of the Markers as negotiable instruments and his allegation that no casino had ever deposited a marker against his account. Caesars' *only* support for its contention that Baumblit was, in fact, aware that the Markers could be deposited against his account are fourteen markers executed by Baumblit in favor of the Mirage Casino and attached to Baumblit's 1994 tax return as proof of gambling losses taken as deductions. Caesars admitted, however, that copies of the backs of the fourteen markers, which would provide evidence as to whether they were presented and cashed, were not attached to Baumblit's 1994 tax return. Caesars has not made any other proffer of those markers but maintains, nonetheless, that the copies of the Mirage markers annexed to Baumblit's return are sufficient evidence of Baumblit's knowledge to put into dispute his contention that he did not know they could be presented against his bank account.

Such "evidence" however, does not raise a genuine issue of fact as to whether markers had ever been deposited against Baumblit's account, much less as to his knowledge of the nature of the instruments. Baumblit's testimony and documentary evidence clearly support the conclusion that the Mirage markers were not deposited against his account. Baumblit testified that, while at the Mirage, he was given a $40,000 credit line and signed various markers in order to access his credit. Upon his return to New York, he paid the Mirage markers at the casino's office in New York by a bank check in the amount of $40,000 dated September 27, 1994. The Mirage then returned the signed markers to Baumblit and gave Baumblit a receipt, dated September 27, 1994. Baumblit forwarded the returned markers and the receipt to his accountant to attach to his tax returns as proof of his gambling losses. A copy of the bank check, copies of the returned markers and a copy of the receipt received from the Mirage are annexed to Baumblit's Response to Plaintiff's Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment. Caesars has provided no other evidence, documentary or otherwise, in support of its allegations. The Court therefore concludes that Caesars' assertion does not raise a genuine issue of fact.

schedule with Caesars, but his attempts failed.

In September 1995 Caesars sent a collection letter, which Baumblit's wife intercepted, to Baumblit's residence. Baumblit's wife subsequently terminated Baumblit's access to BCC funds, evicted him from their home and filed for divorce. Neither BCC nor Mrs. Baumblit has filed a claim in Baumblit's bankruptcy case or commenced an adversary proceeding against him.

On or about September 30, 1995, Caesars presented the Markers for collection against Baumblit's bank account at Republic National Bank. The Markers were dishonored. Although Baumblit's access to BCC funds had been cut off, Baumblit thereafter made limited monthly payments to Caesars until Caesars attached his bank account. Baumblit tendered four checks to Caesars, each in the amount of $2,500, dated October 25, 1995 through January 26, 1996, and tendered one check, dated February 22, 1996, in the amount of $1000. Baumblit paid Caesars a total of $11,000 during this period.

On December 27, 1995, Caesars commenced a civil action against Baumblit in the United States District Court for the District of Nevada (the "Nevada Action"). The first count of the complaint sought collection of the Markers (less the sum previously paid by Baumblit) in the amount of $195,000 plus interest, attorney's fees and costs. The second count of the complaint sought statutory damages in the amount of $500 for each of the twelve dishonored instruments under Nevada Revised Statutes section 41.620 plus interest, attorney's fees and costs.[6] Baumblit did not defend the Nevada Action and, on April 10, 1996, Caesars was granted a default

judgment against Baumblit in the amount of $207,348.55 (the "Default Judgment"). Baumblit did not move for reconsideration or take an appeal from the Default Judgment.

During the period from March 1995 through February 1996, Baumblit made payments to various casinos, including Caesars, by checks drawn against his bank account totaling $336,000.[7] Such amounts were in addition to the $72,000 paid to Caesars out of Baumblit's gambling winnings earned while at the casino in August 1995.

Baumblit first consulted bankruptcy counsel in March of 1996. He filed his Chapter 7 bankruptcy petition on June 11, 1996. The instant adversary proceeding was commenced on September 13, 1996.

Baumblit's schedules filed in connection with his Chapter 7 petition indicate a total gambling debt of $613,500.[8] No other casino creditor has commenced an adversary proceeding in this bankruptcy case.

## DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides in pertinent part that summary judgment in favor of a moving party

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

6. Nevada Revised Statutes section 41.620 provides, in relevant part, that "Any person who makes, utters, draws or delivers a check or draft for the payment of money drawn upon any financial institution or other person, when he has no account with the drawee of the instrument or has insufficient money, property or credit with the drawee to pay; ... and who fails to pay the amount in cash to the payee, issuer or other creditor within 30 days after a demand therefor in writing is mailed to him by certified mail, is liable to the payee, issuer or other creditor for the amount of the check, draft or extension of credit, and damages equal to three times the

amount of the check, draft or extension of credit, but not less than $100 nor more than $500."

7. Baumblit's undisputed evidence indicates that during such period Baumblit paid the Trump Taj Mahal $85,000, Trump Plaza Associates $91,500, Caesars $11,000, CBR $85,000, the Showboat $10,500, and the Mirage $53,000.

8. CBR—$90,000; Caesars—$189,000; Mirage Casino Hotel—$64,500; Showboat Casino Hotel—$90,000; Trump Plaza Hotel & Casino— $65,500; Trump Taj Mahal Casino—$114,500.

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial ... [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–250, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505. Where the defendant moves for summary judgment, "[t]he judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Id.* (citations omitted).

A defendant's summary judgment motion may be granted even where the defendant's state of mind is at issue. "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Id.* at 257, 106 S.Ct. 2505.

Rule 56 permits a Court to consider the entire record and does not limit a Court's review to that portion highlighted by the motion. *See Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir.1996); *Wonder-Bowl Properties v. Kim*, 161 B.R. 831, 838 (9th Cir. BAP 1993).

### A. Count I—Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code provides, in pertinent part, that

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

11 U.S.C. section 523(a)(2)(A).

The policies underlying the Bankruptcy Code require that exceptions to discharge be construed strictly against creditors and in favor of a fresh start for honest but unfortunate debtors. *See, e.g., AT&T Universal Card Services v. Alvi*, 191 B.R. 724 (Bankr.N.D.Ill.1996); *AT&T Universal Card Services v. Feld*, 203 B.R. 360 (Bankr. E.D.Pa.1996); *Chevy Chase Bank, FSB v. Briese*, 196 B.R. 440, 445 (Bankr.W.D.Wis. 1996). In an action under section 523(a)(2)(A) of the Bankruptcy Code, the creditor has the burden of establishing nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The issue of nondischargeability under section 523(a)(2)(A) is determined under standards traditionally associated with an action for fraud under common law. *See Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *AT&T Universal Card Services Corp. v. Akdogan*, 204 B.R. 90, 94 (Bankr.E.D.N.Y.1997); *Feld*, 203 B.R. at

363.[9] Under these standards, a plaintiff must establish that it relied to its detriment on a material misrepresentation that was intentionally made. *Field,* 516 U.S. at 67–68, 116 S.Ct. 437. The test is generally articulated as a five-part one, requiring that the plaintiff prove: (1) that the debtor made false representations; (2) that at the time they were made the debtor knew they were false; (3) that the debtor made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made. *See In re Anastas v. American Savings Bank,* 94 F.3d 1280, 1284 (9th Cir.1996); *Akdogan,* 204 B.R. at 94; *Feld,* 203 B.R. at 365. Proof of each element by a preponderance of the evidence is essential to a successful showing that a given debt is nondischargeable. *See Grogan,* 498 U.S. at 291, 111 S.Ct. 654; *Feld,* 203 B.R. at 365.

As explained below, the evidence submitted by the parties demonstrates that Caesars cannot prove that Baumblit made an intentional misrepresentation on which Caesars relied justifiably. Thus, no disputed issue of material fact precludes resolution of this matter on summary judgment and, because Defendant is entitled to judgment as a matter of law, the Court will grant summary judgment in Defendant's favor with respect to the First Claim for Relief.

*Intent to Repay*

No evidence has been offered to show that Baumblit made an express representation of his intent to repay. Caesars argues, rather, that Baumblit's conduct in accepting the credit, coupled with his execution of the Credit Application and the Markers, constituted an implied representation of intent and ability to pay. Such an argument is often raised in applying section 523(a)(2)(A) in the credit card debt context to compensate for the tripartite nature of a typical credit card transaction, which involves no face to face contact between the cardholder and the lender. In applying section 523(a)(2)(A) in such

contexts, many courts have held that the use of a credit card constitutes an implicit representation to the card issuer. Courts have variously held that such use is an implied representation that the holder has the intent and/or the ability to pay the issuer for the charged purchases and advances. *See e.g. In re Anastas v. American Savings Bank,* 94 F.3d 1280 (9th Cir.1996) (representation of intent to repay): *AT&T Universal Card Services Corp. v. Akdogan,* 204 B.R. 90 (Bankr. E.D.N.Y.1997) (representation of intent to repay); *Chevy Chase Bank, FSB v. Briese* 196 B.R. 440 (Bankr.W.D.Wis.1996) (representation of intent and ability to pay); *First Card Services v. Flynn,* 184 B.R. 8 (Bankr. E.D.N.Y.1995) (representation of intent and ability to repay); *Chevy Chase F.S.B. v. Pressgrove,* 147 B.R. 244 (Bankr.D.Kan.1992) (representation of intent and ability to repay); *Household Card Services/Visa v. Vermillion,* 136 B.R. 225 (Bankr.W.D.Mo.1992) (representation of intent and ability to repay).

The proposition that credit card users make an implicit representation that is significant in the context of a nondischargeability analysis as to their *ability* to pay at the time they use their cards is inconsistent with the plain language of section 523. *See In re Cacciatore,* 209 B.R. 609 (Bankr. E.D.N.Y.1997), *rev'd on other grounds* 1998 WL 412644 (E.D.N.Y.1998). Sections 523(a)(2)(A) and 523(a)(2)(B) clearly preclude reliance on unwritten representations respecting a debtor's financial condition as a basis for nondischargeability under section 523(a)(2)(A). A nondischargeability cause of action based on representations regarding the defendant's financial condition (*e.g.,* the defendant's ability to pay) must be brought under section 523(a)(2)(B), which provides for such a cause of action based on material *written* misrepresentations only. Caesars has not interposed a cause of action under section 523(a)(2)(B) and neither the Credit Application nor the Markers included a written statement of Baumblit's financial condition. Therefore, this Court rejects Caesars'

**9.** *See also Alvi,* 191 B.R. at 728 (most courts analyze false pretenses, false representation and actual fraud under a single test).

contention that Baumblit's conduct created an actionable implied representation of his ability to pay.[10]

However, the notion of an implied representation of an intent to perform a contract (*i.e.*, to repay the credit drawn upon in the instant case) is consistent both with assumptions underlying an extension of credit transaction and with established tort law. Under the common law of torts, entry into a contract with no intention to perform in accordance with its terms is actionable as a misrepresentation of fact as to the contracting party's state of mind. *See* Restatement (Second) of Torts (1976) section 530; *In re Cacciatore*, 1998 WL 412644 *1 (E.D.N.Y. 1998)

Caesars has failed to provide any evidence of a misrepresentation of Baumblit's intent to repay. By signing the Credit Application, Baumblit implicitly represented his intention to repay the debt. Nothing in the record supports the notion that Baumblit made any representation as to the timing or source of such repayment. Caesars conceded, at oral argument on these motions, that Baumblit did in fact intend to pay with funds readily accessible to him through BCC. Therefore, there was no misrepresentation of Baumblit's intent to repay the credit. That Baumblit may not have been authorized to use those monies to fund his gambling habit does not support a finding of a misrepresentation of intent to pay.

Caesars argues, nonetheless, that it would be bad public policy to allow the debtor to discharge this debt when he intended to pay it with misappropriated funds. Caesars does not provide any legal support for such argument, and the Court finds no reason to create such a rule. Caesars has offered no evidence to indicate that Baumblit misled it as to either his intent to repay or as to his ability to repay. To the extent Baumblit intended to injure anyone, the injured party would have been his wife or BCC (neither of which has, the Court notes, filed a claim or commenced an adversary proceeding in Baumblit's bankruptcy case). There is no reason to label such possible intended harm as fraud and impute the status of fraud victim to Caesars. Although the Court does not condone Baumblit's behavior, his subjective intention to pay with readily available funds that may or may not have been his to use for gambling does not give Caesars a cause of action under section 523(a)(2)(A).

Other undisputed facts also evidence Baumblit's intent to pay. During the course of his stay at Caesars, Baumblit paid Caesars $72,000 from his winnings towards his gambling debt. He attempted to negotiate a repayment plan with Caesars. He made monthly payments to Caesars until his bank account was attached. In an effort to ensure

10. In its opposition to Baumblit's motion, Caesars states that each of the Markers and the Credit Application contained a representation of the Defendant's bank and account number, to which Caesars could turn for payment in full in the event the debt was not paid by the Defendant. From this Caesars concludes that the signing of the Markers and Credit Application constituted a representation that the account identified contained enough money to cover the debt. In fact, unlike marker forms used by certain other casinos (copies of which were attached to tax returns made part of the record on this motion), neither the Credit Application nor the Markers included any express representation that the identified bank account contained any funds at all. The Credit Application simply asked for the applicant's bank and account number. Boilerplate language printed on each of the Markers provides in relevant part: "I authorize payee to complete any of the following items on this negotiable instrument: (1) any missing amounts; (2) a date; (3) the name, account number and/or address and branch of any bank or financial institution; and (4) any electronic encoding of the above items. **This information can be for any account from which I may in the future have the right to withdraw funds, regardless of whether that account now exists or whether I provided the information on the account to the payee."** (Emphasis supplied). That the Markers provided for collection from accounts not yet in existence undermines Caesars' argument that signing the Markers constituted a representation that the accounts identified on the Markers contained funds sufficient to cover the debt. Moreover, Caesars provides no legal support for the proposition that Baumblit's simple identification of an account number on the Credit Application constituted an implied representation that there were at the time sufficient funds in that account. Nor does Caesars address the Supreme Court's holding in *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), that a check does not constitute the drawer's representation of sufficient funds in the account against which the check is drawn.

his continued access to BCC funds, he advised Caesars not to mail correspondence to his home so that his wife would remain uninformed about his gambling. Baumblit's history of repayment to other casinos further makes it clear that there is no genuine issue of material fact as to intent to pay Caesars or the sufficiency of funds then available to him.

 That Baumblit was ultimately unable to pay is not relevant to ascertaining his fraudulent intent. "Under the common law a promise to perform a statement of future intention is actionable as fraud only if, at the time the statement was made, the debtor never intended to honor his statement." *Chase Manhattan Bank v. Murphy*, 190 B.R. 327, 332 (Bankr.N.D.Ill.1995), *citing* the Restatement (Second) of Torts (1976) § 530(1) ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention."). "The Restatement (Second) of Torts, section 526, indicates that an objective 'reasonable person' standard is inappropriate when ascertaining fraudulent intent. One of the comments to section 526 states that the issue is not whether a person 'of ordinary care and intelligence' would have recognized the statement as false, but whether the person making the statement (in this case the debtor) was aware of the falsity." *Briese*, 196 B.R. at 451 *citing* the Restatement (Second) of Torts (1976), section 526 comment d. "Thus, although the reasonableness of the debtors' belief as to the truth of their representations may be circumstantial evidence of their intent, ultimately the issue is their actual intent and not the objective reasonableness of it." *Id.*, at 452. "A debtor may honestly, if mistakenly, believe he can repay a debt without falling prey to the penalties found in § 523(a)(2)(A)." *Id.*

*Job Title; Reliance*

Although Baumblit's signed Credit Application included a representation that he was president of BCC, it is undisputed that at the

time he completed the application he was not the president of BCC, but was instead, its general manager.[11] While Caesars argument with respect to Baumblit's status at BCC is not a model of clarity, Caesars has attempted to raise the issue of its reliance on such misrepresentation to support its claim of nondischargeability under section 523(a)(2)(A).

 First, the Court observes that the issue of Baumblit's misrepresentation as to his status at BCC was raised by Caesars simply in connection with Baumblit's ability to repay the credit extended. Caesars argued that it would not have extended the credit had it known the true state of Baumblit's financial condition—*e.g.*, that Baumblit "only earned $850.00 per week, that he owed more than $400,000.00 collectively to casinos (not including Caesars Palace), that he was not president and did not own Baumblit Construction, or that he was such a man as to steel [sic] $209,000 from his wife to secure financing for his continued gambling binges." Plaintiff's Memorandum of Points and Authorities In Support of Motion for Summary Judgment at 22. To the extent that claiming the title of president could be considered an implicit misrepresentation as to his ability to pay, as discussed previously in this opinion, an implicit misrepresentation of ability to pay is not actionable under section 523(a)(2)(A).

 Moreover, there is no evidence in the record of Caesars' actual or justifiable reliance on Baumblit's statement that he was president of BCC. The Supreme Court has made it clear that section 523(a)(2)(A) requires a demonstration of "justifiable reliance" on the debtor's fraudulent conduct:

[B]oth actual and 'justifiable' reliance are required.... The Restatement [ (Second) of Torts (1976) ] expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'

11. Baumblit has denied authorship of the handwritten notation indicating "Pres," on the Credit Application. *In his affidavit in opposition to* Caesars' summary judgment motion. Baumblit stated that he neither read the application before signing it nor represented to Caesars that he was the president of BCC. For purposes of this motion, however, the Court will assume that Defendant made such a representation.

*Field,* 516 U.S. at 70, 116 S.Ct. 437 (citations omitted). The gravamen of a cause of action sounding in fraud is the notion that the complaining party has been induced to action or inaction by, and suffered some loss by reason of, the allegedly fraudulent conduct. The reliance inquiry—whether the complaining party's actions had anything to do with the debtor's allegedly fraudulent conduct, and whether the complaining party's response to that conduct was justifiable—is central to these issues. If the complaining party acted without regard to the alleged fraud, or if the reliance was not justifiable, a fraud-based cause of action cannot be sustained. *Cacciatore,* 209 B.R. at 614, *rev'd on other grounds,* 1998 WL 412644 (E.D.N.Y.1998); *See Field,* 516 U.S. at 67–68, 116 S.Ct. 437; *see also Akdogan,* 204 B.R. at 95.

■ The undisputed evidence indicates that credit was extended simply because Baumblit was a referral from Caesars' sister entity in Atlantic City. In establishing Baumblit's credit line and in extending more than $200,000 of unsecured credit, Caesars relied solely upon the information provided orally over the telephone by Mr. DiBart of CBR. While Baumblit was required to execute the Credit Application and the Markers, the decision to extend credit was based upon the historical information received by CBR rather than on any additional information supplied by Baumblit.

■ Additionally, the mischaracterization of Baumblit's title as president of BCC was not a material misrepresentation under the circumstances of this case. There is no dispute as to Baumblit's power to manage and bind BCC at the time he executed the Credit Agreement. In this context, the distinction between a "president" and a "general manager" with the undisputed control that Baumblit had over that closely held company is immaterial. Moreover, Caesars has failed to provide any evidence to support a finding that Baumblit would have been denied credit had Caesars known that he was the general

manager of BCC as opposed to its president. Given Baumblit's uncontested authority and control over BCC and Caesars' complete reliance on the information provided to it by CBR in issuing the credit, it cannot be said that Baumblit's actions, or representations inferable therefrom, were relevant to Caesars' course of action. "[W]holly immaterial misrepresentations which have no effect on a creditor's decision" are not a bar to discharge. *Field,* 516 U.S. at 68, 116 S.Ct. 437; *See also* Restatement (Second) of Torts (1976) section 538 ("Reliance upon a fraudulent misrepresentation is not justifiable unless the matter misrepresented is material.")

Summary judgment may therefore be granted in Defendant's favor on Plaintiff's First claim for relief because Caesars has failed to meet its burden of proof with respect to the elements of intentional misrepresentation and reliance as required under section 523(a)(2)(A).

**B. Counts Two and Three—Section 523(a)(6)**

Plaintiff's Second and Third Claims for Relief, pursuant to 11 U.S.C. section 523(a)(6), are predicated upon Baumblit's issuance of checks without sufficient funds in contravention of Nevada law.[12]

Section 523(a)(6) of the Bankruptcy Code provides:

(a) A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

The Supreme Court recently examined whether the scope of section 523(a)(6) encompasses acts, done intentionally, that cause injury, or only acts done with the actual intent to cause injury. *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The Court stated:

---

12. The Court does not discern any meaningful difference between Counts Two and Three of the complaint. Count Two prays for nondischargeability pursuant to section 523(a)(6) based upon Baumblit's issuance of negotiable instruments back by insufficient funds in "wanton and willful

disregard for Nevada law". Count Three prays for nondischargeability pursuant to section 523(a)(6) based upon Baumblit's issuance of negotiable instruments backed by insufficient funds in "wanton and willful disregard for the rights of Caesars Palace under Nevada law."

The word 'willful' in (a)(6) modifies the word 'injury', indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead 'willful acts that cause injury.' Or, Congress might have selected an additional word or words, i.e., 'reckless' or 'negligent,' to modify 'injury.' Moreover ..., the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.' Restatement (Second) of Torts § 8A, comment a, p. 15 (1964).

*Geiger,* 118 S.Ct. at 977.

The Court concluded that negligent or reckless acts do not suffice to establish that a resulting injury is "willful and malicious" and that, therefore, debts arising from recklessly or negligently inflicted injuries do not fall within the compass of section 523(a)(6). *Id.* at 978.

Plaintiff argues that Baumblit engaged in willful and malicious conduct by intentionally signing the Markers at a time when he knew his personal and joint accounts contained insufficient funds to cover the face amount of the instruments; that Baumblit ignored the true state of his financial affairs and executed the Markers at a time when he should have been able to foresee that he would not be able to repay Caesars. Caesars claims that Baumblit's actions were "intentionally [sic], wanton and in reckless disregard for the rights of Caesars Palace. Defendant knew at the time he made and delivered the Credit Instruments that if he lost, Caesars Palace could and would not be paid." Plaintiff's Memorandum of Points and Authorities In Support of Motion For Summary Judgment at 16. Caesars reasons that it is entitled to a judgment of nondischargeability under section 523(a)(6) because such intentional acts caused Caesars harm by inducing Caesars to advance credit.

 *Geiger* teaches that intentional torts, as distinguished from negligent or reckless torts, require that the actor intend the consequences of the act and not simply the act itself. *Geiger,* 118 S.Ct. at 977. Applying this standard, Caesars may only be granted a judgment of nondischargeability under section 523(a)(6) if Baumblit delivered the Markers with the intent to cause Caesars harm by failing to repay the credit extended. However, the undisputed facts preclude such a finding. Plaintiff has conceded that Baumblit intended to repay Caesars from the BCC funds he believed to be accessible to him. Baumblit's intent to repay is further evidenced by the fact that he paid Caesars $72,000 from his winnings and made $11,000 in payments even after his access to BCC funds was terminated. Baumblit's ultimate default on the obligation, due to intervening circumstances, is not relevant to ascertaining his intent at the time he delivered the Markers. Caesars has failed to meet its burden with respect to the element of intent as required under section 523(a)(6). Summary judgment may therefore be granted in Defendant's favor on Plaintiff's Second and Third Claim for Relief.

## C. Count Four—Nondischargeability Pursuant to 28 U.S.C. Section 1738

 At oral argument, Caesars conceded that its Fourth Claim for Relief seeking nondischargeability of the subject debt on the basis of collateral estoppel and full faith and credit principles pursuant to 28 U.S.C. section 1738, was not well founded. Counsel admitted, *inter alia,* that because the Nevada action was not based on fraud, the Default Judgment rendered in that action does not have collateral estoppel effect on the fraud component of the instant dischargeability action.[13] Given this concession, summary judgment is granted in Defendant's favor on Plaintiff's Claim for Relief.

---

**13.** Counsel stated that any collateral estoppel effect would be limited to the liquidation of the debt. Baumblit has not disputed the amount of the debt.

**D. Count Five—Dischargeability of Caesars Legal Fees and Costs Pursuant to 11 U.S.C. Sections 523(a)(2)(A) and (a)(6)**

 Caesars does not dispute that the nondischargeability of its fees and costs is dependent upon the status of the primary debt. Because Caesars has not established that Baumblit's debt to Caesars is nondischargeable under section 523(a)(2)(A) or section 523(a)(6), Caesars' attorneys fees and costs in connection with this adversary proceeding are dischargeable. Defendant's summary judgment motion is therefore granted with respect to Caesars' Fifth Claim for Relief.

**E. Baumblit's Request for Attorneys' Fees, Costs and Sanctions.**

Defendant's motion requesting costs and attorneys' fees under 11 U.S.C. section 523(d) and sanctions under Federal Rule of Bankruptcy Procedure 9011 is granted to the extent that the Court will award Defendant his costs and reasonable attorneys' fees for defense of this adversary proceeding in an amount to be determined through a later evidentiary proceeding.

Section 523(d) provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

 The creditor can defeat a motion under this provision by establishing that its nondischargeability action was substantially justified in that it had a reasonable basis in law and fact or that there existed special circumstances. *See American Savings Bank v. Harvey*, 172 B.R. 314, 318 (9th Cir. BAP 1994); *In re Williams*, 224 B.R. 523, 531 (2d Cir. BAP 1998). "The creditor must be sub-

stantially justified at all times through trial to be insulated from paying attorneys' fees under § 523(d)." *In re Williams*, 224 B.R. at 530. "A creditor must bring its claim against a debtor in good faith and, likewise, abandon its claim once it learns that the case is not substantially justified. If the creditor continues with its case past the point of substantial justification, it must be made to pay the Debtor's attorneys' fees in defending against the action. Conversely, if a creditor's pre-trial investigation and discovery show that its claim against the debtor is not substantially justified and withdraws its claim, it should not be required to pay attorneys' fees to the debtor." *Id.*

 The Court finds that the position taken by Caesars was not substantially justified, and that no special circumstances are present that would make the award of attorneys' fees and costs unjust. Caesars provided no evidence to support the intentional harm elements of its causes of action under sections 523(a)(2)(A) and (a)(6). Caesars admitted, at the hearing on these motions, that it did not dispute Baumblit's intent to repay the credit. Caesars should have known that it could not satisfy its burden either under section 523(a)(2)(A) or (a)(6). Although Caesars argued that, as a matter of policy, the debt should be held nondischargeable because the Debtor intended to repay Caesars with misappropriated BCC funds, Caesars failed to provide the Court with any legal support for this contention. The Court finds that such argument did not provide substantial justification for pursuing this litigation. Furthermore, Caesars conceded at the hearing on these motions that its Fourth Claim for Relief, under 28 U.S.C. section 1738, was not properly interposed. This concession was not made until after Defendant had fully addressed the issue of collateral estoppel in his papers submitted in connection with these motions.

 Moreover, an attorney is under an affirmative duty to make a reasonable investigation of the facts before filing a pleading or motion. *See* Fed.R.Bankr.P. 9011.[14] In signing or filing papers, an attor-

---

14. The instant motions were interposed subse-

quent to the December 1997 amendment to Fed.

ney certifies to the court that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Bankr.P. 9011(b)(3), *See In re Jenkins,* 225 B.R. 29 (Bankr.D.Conn.1998). "[Rule 11] 'explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable *inquiry* into the viability of a pleading before it is signed.' This requirement assumes that lawyers are prepared to demonstrate that they have done the necessary investigation prior to appearing in court." *Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.,* 875 F.2d 388, 390 (2d Cir.1989) (citation omitted). The Court must determine, in considering whether to impose Rule 9011 sanctions, whether, after reasonable inquiry, a competent attorney could form a reasonable belief that the pleading is well grounded in fact and warranted by existing law or contains a good faith argument for the extension, modification or reversal of existing law.

> R.Bankr.P. 9011. The rule, as amended, provides in relevant part:
> (a) Signature. Every petition, pleading, written motion, and other paper, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name. A party who is not represented by an attorney shall sign all papers. Each paper shall state the signer's address and telephone number, if any. An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.
> (b) Representations to the court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
> > (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> > (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> > (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

*In re 680 Fifth Avenue Assoc.,* 218 B.R. 305 (Bankr.S.D.N.Y.1998).

The Court finds that reasonable investigation and appropriate discovery conducted prior to the commencement of this adversary proceeding (or at the very least, prior to the litigation of these motions) would have revealed to Caesars the fact that Baumblit intended to repay the credit. Had Caesars' conducted reasonable inquiry as required by Rule 9011, the flaws in its legal position, with regard to each of the counts asserted in its complaint, would have been apparent.

An award of Defendant's reasonable attorneys' fees and costs incurred in defending this adversary proceeding is therefore appropriate pursuant to both section 523(d) and Rule 9011, each constituting a separate and independent ground for the award. An inquest shall be conducted as to the amount of attorneys fees and costs to be awarded.

> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
> (c) Sanctions. If after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation ...
> > (2) Nature of sanction; Limitations. A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.
> > (A) Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2).
> > (B) Monetary sanctions may not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned. ...

In light of the extensive litigation conducted during the course of these proceedings, the Court regards the award of attorneys fees and costs sufficient to deter similar conduct in the future. *See* Fed.R.Bankr.P. 9011(c)(2). Sanctions shall therefore be limited to such award.

Debtor is directed to settle an order consistent with this opinion and to consult with Caesars' counsel and the Court to schedule a conference to plan the inquest.