**In re Vladimir BAUMBLIT, Debtor.**

**Desert Palace, Inc. d/b/a Caesars Palace, Plaintiff–Appellant, Cross–Appellee,**

**v.**

**Vladimir Baumblit, Defendant–Appellee, Cross–Appellant.**

**Vladimir Baumblit, Plaintiff–Appellee,**

**v.**

**Desert Palace, Inc. d/b/a Caesars Palace, Defendant–Appellant.**

**Nos. 00–5064, 00–5062, 00–5058.**

United States Court of Appeals, Second Circuit.

Aug. 6, 2001.

Howard C. Buschmann, III, New York, NY, for appellant.

Bruce Weiner, Brooklyn, NY; Carlos J. Cuevas, on the brief, for appellee.

Present McLAUGHLIN, POOLER, Circuit Judges. and KOELTL, District Judge.*

## SUMMARY ORDER

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the orders of said District Court be and they hereby are **AFFIRMED**.

Desert Palace, Inc. d/b/a Caesars Palace ("Caesars") appeals from two separate orders dated August 9, 2000 of the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*) that decided appeals from the United States Bankruptcy Court for the Eastern District of New York (Laura Taylor Swain, *Bankruptcy Judge*) in bankruptcy proceedings involving debtor Vladimir Baumblit ("Baumblit"). Caesars first appeals from Judge Gershon's order, *see In re Baumblit*, 251 B.R. 442 (E.D.N.Y.2000), affirming Judge Swain's January 20, 1999 decision granting Baumblit's motion for summary judgment and denying Caesars' claim that Baumblit's debt to Caesars was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). *See In re Baumblit*, 229 B.R. 50 (Bankr.E.D.N.Y.1999). Baumblit cross-appeals from that part of Judge Gershon's order reversing the bankruptcy court's award of attorneys' fees, costs, and sanctions against Caesars.

Caesars also appeals from Judge Gershon's order affirming Judge Swain's July 15, 1998 order granting Baumblit's motion for partial summary judgment on the issue of whether Caesars violated the automatic stay provisions of the Bankruptcy Code by referring Baumblit's dishonored checks to the Bad Check Collections Unit of the District Attorney's Office in Clark County, Nevada and awarding Baumblit actual damages for Caesars' deliberate violation of the automatic stay.

For the reasons explained below, we affirm both orders.

## BACKGROUND

The underlying bankruptcy proceeding resulted from Baumblit's inability to pay a gambling debt to Caesars. Baumblit began gambling at least by 1994 and received credit lines from various casinos, which he used and repaid. Baumblit used funds from Baumblit Construction Company ("BCC") to pay for his gambling losses. Baumblit's wife is the president and sole shareholder of BCC and Baumblit, who was employed as the general manager of BCC, was responsible for the daily operations of BCC. Baumblit was paid a salary of about $850 to $1,000 a week but had full access to BCC funds and would instruct BCC's accountant to advance him bonuses which he used to pay for his gambling debts. Baumblit would advise casinos to send correspondence to his office and not

---

* The Honorable John G. Koeltl, United States District Court Judge for the Southern District of New York, sitting by designation.

to his home to keep his wife from learning about his gambling.

In 1995, Baumblit received a $100,000 credit line from Caesars Boardwalk Regency in Atlantic City, New Jersey ("CBR"), a corporate affiliate of Caesars. CBR referred Baumblit to Caesars as a customer. CBR transmitted Baumblit's credit information to Caesars and informed Caesars that Baumblit had an outstanding debt of $100,000 to CBR. Caesars flew Baumblit to Las Vegas, where on August 17, 1995, Baumblit signed a credit application, providing information such as driver license number, social security number, phone numbers, employment, and an identification of his bank account. The application noted that mail from Caesars was not to be sent to his home. Baumblit made no express representations in writing or orally concerning his ability to repay, intent to repay, financial condition, or the source of any funds that he would use to pay any debts. Caesars initially gave Baumblit a credit line of $100,000, which was increased to $200,000 on his visit. Caesars' determination to grant credit was based on his credit application and his customer history at CBR and other casinos.

Between August 17, 1995 and August 21, 1995, Baumblit drew on his credit line for gambling chips by signing twelve Markers (the "Markers"), negotiable instruments that could be deposited against his bank account, totaling $202,264.00. During his stay, Baumblit won $72,000, which he used to satisfy a portion of his debt. However, by the end of his stay, Baumblit's total losses were approximately $200,000.

In September 1995, Caesars sent a collection notice to Baumblit's house, which Baumblit's wife intercepted. Baumblit's wife terminated Baumblit's access to BCC funds, evicted him from their home, and filed for divorce. On or about September 30, 1995, Caesars presented the Markers for collection against Baumblit's bank account. The Markers were dishonored. Between October 1995 and February 1996, Baumblit paid Caesars approximately $11,000 for his debt.

On December 27, 1995, Caesars commenced a civil action against Baumblit in the United States District Court for the District of Nevada seeking collection of Baumblit's debt to Caesars and statutory damages. Baumblit did not defend against this action and on April 17, 1996, Caesars was granted a default judgment against Baumblit.

Baumblit filed a Chapter 7 bankruptcy proceeding on June 11, 1996. On or about September 12, 1996, Caesars commenced an adversary proceeding arguing, among other things, that Baumblit's debt was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) because Baumblit had allegedly procured his credit line with Caesars through fraud. The bankruptcy court granted Baumblit's motion for summary judgment and denied Caesars' motion for summary judgment because there was no evidence that Baumblit procured his credit line with Caesars through fraud. The bankruptcy court also granted Baumblit's motion for attorneys' fees and costs pursuant to 11 U.S.C. § 523(d) and for sanctions pursuant to Fed. R. Bankr.P. 9011 because it found that a reasonable investigation by Caesars would have revealed that there was no evidence of fraud by Baumblit. On August 9, 2000, the district court affirmed the bankruptcy court's decision on the issue of dischargeability but reversed the bankruptcy court's award of attorneys' fees and sanctions, reasoning that the adversary proceeding involved the novel issue of whether the intent to pay a debt with misappropriated funds should preclude a discharge.

On or about June 24 or 25, 1997, Caesars referred the dishonored Markers signed by Baumblit to the Bad Check Collections Unit ("BCU") of the District Attorney's Office in Clark County, Nevada. The BCU is a "diversionary" program, designed to encourage individuals who wrote bad checks to pay them because of the threat of prosecution without actually incarcerating them. After a victim submits a bad check complaint to the BCU, a form letter is generated notifying the maker of the bad check that the check will be referred to the prosecution unit within 10 days if it is not paid. The prosecution unit decides whether to prosecute the case, which requires filing a separate criminal complaint. In letters dated June 27, 1997, July 3, 1997, and July 14, 1997, Baumblit was informed that his checks had been referred to the BCU and that he faced prosecution if he did not pay the checks. Caesars also informed the BCU that Baumblit had filed a bankruptcy petition. When dealing with a bankrupt individual, the practice of the BCU is not to seek restitution.

Baumblit sought a temporary restraining order ("TRO") against prosecution and on July 11, 1997, the bankruptcy court entered a TRO "enjoining the defendants from commencing or continuing a criminal prosecution against plaintiff based on the credit instruments." On September 12, 1997, in an oral ruling, the bankruptcy court granted Baumblit's motion for a preliminary injunction and found "that Caesars violated the automatic stay by initiating post-petition debt collection procedures with respect to a prepetition debt." The bankruptcy court reasoned that the referral to the BCU did not fall within the exception to the automatic stay for criminal proceedings pursuant to 11 U.S.C. § 362(b)(1) because it was "in the nature of debt collection rather than criminal prosecution." On June 2, 1998, in an oral

ruling, the bankruptcy court granted Caesars' motion for reconsideration of its September 12, 1997 decision and on reconsideration reaffirmed its prior ruling. The Court also granted Baumblit's motions for partial summary judgment, holding that Caesars violated the automatic stay and awarding Baumblit actual damages pursuant to 11 U.S.C. § 362(h). The June 28, 1998 decision was memorialized in a written order issued on July 15, 1998. The district court affirmed the bankruptcy court's order on August 9, 2000.

## DISCUSSION

A district court's appellate review of a bankruptcy court's order is subject to plenary review by this Court. *See In re Roblin Industr., Inc.*, 78 F.3d 30, 33 (2d Cir.1996). This Court reviews a bankruptcy court's decision to grant summary judgment *de novo*. *See In re Treco*, 240 F.3d 148, 155 (2d Cir.2001).

■ Caesars argues that Baumblit's debt was nondischargeable because it fell within the exception to dischargeability set forth in 11 U.S.C. § 523(a)(2)(A), which provides:

(a) A discharge under ... this title does not discharge an individual debtor from any debt—

.  .  .  .  .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

11 U.S.C. § 523(a)(2)(A). There is no evidence that Baumblit obtained credit through "false pretenses, a false representation, or actual fraud." There was no fraud with respect to Baumblit's intention

to repay his debt to Caesars. The parties do not dispute that Baumblit intended to repay his debt to Caesars. The undisputed evidence also shows that Baumblit had access to funds from BCC when he signed Caesars' credit application and intended to repay any gambling debts from those funds as he had in the past.

Caesars argues, however, that Baumblit committed fraud because he intended to repay Caesars by stealing the funds. However, Baumblit was the general manager of BCC, had general responsibility for its operations, and had access to BCC funds. When he had taken bonuses from BCC in the past to supplement his more modest salary for whatever reason he might use that income, he paid income taxes on those funds. Caesars has submitted no evidence indicating that Baumblit's appropriation of funds from BCC constituted theft. There is no evidence that Baumblit's wife or BCC has accused Baumblit of theft in connection with the way in which he was compensated by BCC. At most, there is only evidence that Baumblit's source of funds was unstable.

While Caesars points to evidence that Baumblit misappropriated funds from a joint personal account with his wife to pay other gambling debts, there is no evidence that Baumblit intended to use those funds, rather than bonuses from BCC, to pay any debts to Caesars. Moreover, there was no representation by Baumblit, explicit or implicit, with respect to the source of funds from which he intended to repay his debt to Caesars. Therefore, there was no false representation by Baumblit with respect to the source of the funds from which he expected to repay Caesars. The district court correctly affirmed the bankruptcy court's decision that Baumblit's debt to Caesars was dischargeable.

■ The district court also properly concluded that the bankruptcy court abused its discretion by awarding Baumblit attorneys' fees and costs pursuant to 11 U.S.C. § 523(d) and sanctions pursuant to Fed. R. Bankr.P. 9011. Decisions to impose attorneys' fees and sanctions are reviewed for abuse of discretion. *See United States v. Seltzer,* 227 F.3d 36, 39 (2d Cir.2000). A bankruptcy court is required to award attorneys' fees and costs when a creditor's request for a determination of dischargeability of a consumer debt under 11 U.S.C. § 523(a)(2) is denied and the creditor's position was not "substantially justified," unless the Court finds that "special circumstances" would make the award unjust. 11 U.S.C. § 523(d). Judge Swain acknowledged that Caesars' claim raised "unique and difficult issues," and we agree that these were complex issues. While Caesars did not have controlling authority for its implied misrepresentation theory, there was no legal authority precluding such an argument. Under the circumstances, Caesars' position was "substantially justified." Moreover, Baumblit's motion was properly denied under Fed. R. Bankr.P. 9011 because, as Judge Gershon correctly found, it could not be said that Caesars' argument was a frivolous argument for the extension or modification of existing law. Thus, the bankruptcy court's decision to impose attorneys' fees, costs and sanctions was an abuse of discretion.

■ The district court was also correct in affirming the bankruptcy court's order finding that Caesars' referral of the Markers to the BCU violated the automatic stay and that the referral was not the commencement of a criminal action or proceeding that would be excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(1).[1] The referral was an "act to

1. There was a question with respect to wheth-   er this Court had appellate jurisdiction to

collect, assess, or recover a claim against the debtor that arose before the commencement of the case," 11 U.S.C. § 362(a)(6), that is subject to the automatic stay. The referral did not fall under the exception from the automatic stay provision for "the commencement or continuation of a criminal action or proceeding against the debtor...." 11 U.S.C. § 362(b)(1). The BCU administers a program that attempts to collect payment of bad checks through the threat of prosecution. A different unit of the District Attorney's Office must make a decision whether to prosecute and a separate criminal complaint must be drafted by the prosecutor if a decision is made to prosecute. Therefore, the referral to the BCU did not institute a criminal prosecution against Baumblit and it is undisputed that no decision to prosecute Baumblit was ever made. While Caesars argues that the BCU does not seek restitution from individuals in bankruptcy proceedings, the BCU still threatens prosecution of those individuals without first making an actual decision to prosecute. The mere fact that the BCU is a collection program associated with a local district attorneys' office does not make its actions a criminal proceeding. Furthermore, counsel for Caesars conceded at argument that a referral to the BCU does not toll the statute of limitations for filing

a criminal complaint. Therefore, such a referral could not reasonably be considered the commencement of a criminal proceeding. Thus, the referral of the Markers to the BCU violated the automatic stay.

Moreover, Caesars' actions constituted a deliberate violation of the automatic stay, entitling Baumblit to actual damages pursuant to 11 U.S.C. § 362(h). "[A]ny deliberate act taken in violation of a stay, which the violator knows to be in existence, justifies an award of actual damages." *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1105 (2d Cir.1990). There is no dispute that Caesars deliberately referred the checks to the BCU, and that Caesars was aware of the automatic stay. Therefore, the district court was correct in affirming the bankruptcy court's award of actual damages.

■ Caesars' argument that the bankruptcy court violated its First Amendment rights by holding that Caesars violated the automatic stay by referring the Markers to the BCU is without merit. The referral of Baumblit's Markers to the BCU did not commence criminal proceedings and is no different from any other attempt to collect a pre-petition debt that would violate the automatic stay. "It is well settled that First Amendment rights are not immun-

hear this appeal pursuant to 28 U.S.C. § 158(d), which confers appellate jurisdiction over final decisions, judgments, orders and decrees by district courts hearing bankruptcy appeals, because, when the district court issued its decision, the bankruptcy court had not yet resolved whether punitive damages should be awarded for Caesars' violation of the automatic stay. Thus, the decision reviewed by the district court was not yet final. However, while this appeal was pending, the bankruptcy court dismissed the claim for punitive damages pursuant to a stipulation and order dated May 30, 2001. While the bankruptcy court's original order had not disposed of all issues when the district court reviewed it, district courts do have jurisdiction to re-

view appeals from both final and interlocutory orders in bankruptcy cases. *See In re Chateaugay Corp.*, 922 F.2d 86, 88–90 (2d Cir.1990). By resolving all issues of relief with respect to the violation of the automatic stay, the stipulation sufficiently resolves any issues of finality with respect to both the bankruptcy court order and the district court order so that this Court has appellate jurisdiction pursuant to 28 U.S.C. § 158(d). *See Leonhard v. United States*, 633 F.2d 599, 611 (2d Cir.1980) ("In the absence of prejudice to the nonappealing party, this Court too has declined to dismiss premature notices of appeal where subsequent actions of the district court have imbued the order appealed from with finality.")

ized from regulation when they are used as an integral part of conduct which violates a valid statute." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 514, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The bankruptcy court's holding that Caesars violated the automatic stay did not violate Caesars' First Amendment rights.

We have examined the parties' remaining arguments and find them without merit. The district court orders are therefore affirmed.