In re Richard Bradley
MILLER, Debtor.

Mandalay Resort Group, Plaintiff,

v.

Richard Bradley Miller, Defendant.

Bankruptcy No. LA 01–41847SB.
Adversary No. LA 02–01149 SB.

United States Bankruptcy Court,
C.D. California.

May 6, 2004.

Karen A. Ragland, Los Angeles, CA, for plaintiff.

Richard Bradley Miller, Venice, CA, pro per.

## OPINION AFTER TRIAL

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. Introduction

Creditor Mandalay Resort Group ("Mandalay") seeks a determination that the debt owing on three markers (which are the same as checks), issued by debtor Richard Miller to obtain gambling chips at the Mandalay Bay casino in Las Vegas, is not dischargeable. Mandalay contends that the debt is based on false pretenses, false representations or actual fraud, and thus is nondischargeable under § 523(a)(2)(A).[1]

After trial on the merits, the court finds that a debt based solely on an unpaid check is not nondischargeable under § 523(a)(2)(A) as a debt based on actual

---

1. Unless otherwise specified, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (West 2004).

fraud, where there is no evidence of the underlying transaction. The court further finds that, under Ninth Circuit law, the terms "false pretenses" and "false representation" are equivalent to "actual fraud," as these terms are used in § 523(a)(2)(A), and provide no separate grounds for the nondischargeability of such a debt. A debt based solely on an unpaid check is nondischargeable (if at all) only as a debt arising from willful and malicious injury under § 523(a)(6).

The court further finds that Miller did not intend to injure Mandalay by failing or refusing to pay the debt arising from the unpaid portion of the markers. Miller made substantial payments on the debt over a period of nine months after incurring the debt at issue, and did not file this bankruptcy case until nearly fifteen months after issuing the markers. Thus the debt is dischargeable on these grounds as well.

## II. Relevant facts

Obtaining credit at the Mandalay Bay casino in Las Vegas is apparently a four-step process. First, the customer makes an application for credit to the casino. Second, the casino does a credit check, and in particular verifies that the customer has funds in one or more bank accounts to cover the credit requested.[2] Third, the casino approves the credit request after receiving appropriate bank account information. Fourth, the customer signs and delivers a marker (a type of check) to the casino, to draw money against the bank account and purchase gambling chips to use in casino games.

Mandalay showed at trial that Miller engaged in at least five gambling sessions at Mandalay Bay in 1999 and 2000. The evidence shows that he also engaged in gambling at several other Las Vegas gambling establishments during the same time frame.

Miller first obtained credit at Mandalay Bay on July 1, 1999,[3] when he obtained a $10,000 credit line, of which he used and repaid $7,500. In August, 1999 Miller returned for a second gambling trip and obtained a credit line of $20,000, of which he used and repaid $17,500. In September, 1999 Mandalay extended Miller new credit of $30,000 for a third gambling session, which Miller again drew down and then repaid. On November 9, 1999 Mandalay checked Miller's credit-worthiness in Las Vegas, presumably to determine whether to give him credit for a fourth gambling session, and learned that Miller had credit outstanding at three clubs, and he had an unpaid debt to Mirage of $2,000. Mandalay granted Miller credit of $25,000 on this occasion, which Miller did not repay until January 12, 2000.

This litigation arises out of Miller's fifth gambling trip to Mandalay Bay. On August 25, 2000 Mandalay granted Miller $10,000 in credit and accepted his $10,000 marker for gambling chips. On August 26 Mandalay checked Miller's credit through Central Credit, a Las Vegas service that reports credit information granted by Las Vegas casinos to their common customers,

---

2. Mandalay normally expects a customer to have enough money on deposit in a bank account to cover the total amount of credit that it grants to a customer for markers.

3. No admissible evidence was presented to show that Miller made a credit application. Mandalay offered in evidence exhibit 1, which was identified as a credit application. While Mandalay's witness described it as the front and back of a one-page document, the copy offered is a poor reproduction largely obscured by a copy of what appears to be Miller's driver license. One side of the document was altogether cut off in the copying. The court denied admission of this document.

and learned that Miller's gambling debt, owed to Bellagio and Mirage, had ballooned to $60,000. In addition, Mandalay learned from this credit check that Miller was late in paying $10,000 of his debt to Bellagio. Nonetheless, Mandalay gave Miller an additional $10,000 credit line on August 26 and accepted a second $10,000 marker to purchase gambling chips on that date. On August 28, 2000 Mandalay rechecked Miller's bank account information, and verified that Miller had a low six-figure balance (more than $100,000), and an average balance in the same range, in his Wells Fargo bank account in Southgate, California. On that date (probably after obtaining the new bank report) Mandalay approved an additional $30,000 credit line (for a total of $50,000 in credit) and accepted two additional markers, one for $10,000 and one for $20,000.

Mandalay estimated that, on this late August gambling trip, Miller spent approximately 14.5 hours gambling at the Mandalay Bay casino, and that he made bets averaging $2841. Mandalay estimated that he lost $49,300 in gambling at its casino during this trip.[4]

On August 29 Mandalay submitted the $50,000 in markers to Miller's Wells Fargo bank account for collection. Each of the three markers here at issue,[5] which total $40,000, was eventually returned to Mandalay unpaid.

After the markers totaling $50,000 did not clear at Miller's bank, he made payments to Mandalay on this debt totaling $19,000. He made these payments on October 24, 2000 ($10,000), November 28, 2000 ($5,000), January 17, 2001 ($2,500),

May 9, 2001 ($1,000) and August 9, 2001 ($500). These payments leave a total unpaid balance of $31,000.

Miller filed his chapter 7 bankruptcy case more than a year later, on October 23, 2001. Mandalay filed this adversary proceeding in Miller's case, and Miller filed an answer. However, Miller thereafter failed to appear or defend in the adversary proceeding.

At pretrial, after briefing on the issue, this court held that gambling debts are not collectible in California courts, including this court, on public policy grounds. The Ninth Circuit Bankruptcy Appellate Panel reversed, and held that the collectibility of the debt must be determined under Nevada law. *See Mandalay Resort Group v. Miller (In re Miller)*, 292 B.R. 409 (9th Cir. BAP 2003).

Thereafter the court held a trial on the merits, for Mandalay to make a prima facie case that the debt is nondischargeable. Miller failed to attend the trial. After trial the matter was submitted.

### III. The Law of Checks

Before examining the admissibility of the evidence offered in this case and the application of § 523(a)(2)(A), a brief overview of the law of checks is useful. The business community relies on checks to effect payment for goods and services and for financing such transactions. This law is ancient: it arose as part of the law merchant (*lex mercatoria*) in the Middle Ages to facilitate the business transactions of merchants and mariners in the commercial countries of the world. *See, e.g.,* BLACK'S LAW DICTIONARY 893 (7th ed.1999).

---

**4.** According to Mandalay's records, Miller was particularly unlucky in his gambling on this trip. Given the gambling that it observed him doing, Mandalay estimated that an average gambler would have lost $25,881.

**5.** The court knows little about the August 25, 2000 marker for $10,000. It was not offered in evidence, and no testimony on it was given. The only evidence on it is contained in the documents received in evidence.

▇ A casino marker is a type of check, drawn on the customer's bank account designated in the instrument, and is subject to the legal regime governing checks. *Nguyen v. Nevada*, 116 Nev. 1171, 1175, 14 P.3d 515, 518 (2000). The law governing checks is Article 3 of the Uniform Commercial Code ("UCC"), as adopted in the various states, which governs negotiable instruments.[6] *See* UCC § 3–102(a)(2004).

A few basic concepts will facilitate the discussion. A check typically involves three parties, (1) the "drawer" who writes the check,[7] (2) the "payee" to whose order the check is made out, and (3) the "drawee" or "payor bank", the bank which has the drawer's checking account from which the check is to be paid.[8] In form, a check is an order to the drawee bank to pay the face amount of the check "to the order of" the payee. After receiving the check, the payee typically indorses[9] it on the back, and then deposits it in the payee's account in a different bank, the "depositary bank".[10] The depositary bank credits the check to the payee's account, and sends the check through the check clearing system to the payor bank for ultimate payment from the drawer's account. *See generally Roy Supply, Inc. v. Wells Fargo Bank*, 39 Cal.App.4th 1051, 1058–59, 46 Cal.Rptr.2d 309, 313–15 (1995).

A check is a species of documents called "commercial paper," "instruments" or "negotiable instruments."[11] *See* UCC § 3–104. With exceptions not here relevant, a "negotiable instrument" means:

> an unconditional promise or order to pay a fixed amount of money ... if it:
>
> (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
>
> (2) is payable on demand or at a definite time; and
>
> (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money ....

UCC § 3–104(a). Where Article 3 refers to an "instrument", it means such a negotiable instrument. *See id.* § 3–104(b).

Article 3 divides instruments into two categories—notes and drafts. *See id.* § 3–104(e) & comment 4. A note is a promise to pay a fixed amount of money (usually plus interest), and a draft is an order to pay a fixed amount of money. *See id.* § 3–104(a) & (e). A check (apart from a cashier's check or teller's check) is a draft payable

---

**6.** The court here relies on the model version of the UCC as promulgated by the National Conference of Commissioners on Uniform State Laws, rather than a particular state version thereof. As a general rule, bankruptcy law relies on general common law rather than the law of any particular state. This practice "reflects the fact that federal statutes are generally intended to have uniform nationwide application." *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 740, 109 S.Ct. 2166, 2173, 104 L.Ed.2d 811 (1989) (quotations omitted).

**7.** *See* UCC § 3–103(a)(5).

**8.** *See id.* § 3–103(a)(4).

**9.** UCC § 3–204 provides in relevant part:

"Indorsement" means a signature ... made on an instrument for the purpose of ... negotiating the instrument ....

A typical indorsement on a check consists simply in the signing of the name of the payee on the back of the check. Such an indorsement is a "blank indorsement," which converts the check into a bearer instrument which, like cash, may be negotiated by transfer of possession alone. *See id.* § 3–205(b).

**10.** *See id.* § 4–105(2).

**11.** In addition to checks, negotiable instruments include promissory notes, drafts, cashier's checks, teller's checks, money orders, traveler's checks and certificates of deposit. *See* UCC § 3–104.

on demand and drawn on a bank. *See id.* § 3–104(f). Thus a check is an order to a bank, payable on demand of the payee or transferee, to pay a fixed sum of money.

If a draft (including a check) is paid by a bank, the payment on the draft is completed and the drawer is discharged. *See id.* § 3–601(a). If an unaccepted check is dishonored by the bank, the drawer is obliged to pay it according to its terms at the time it was issued. *See id.* § 3–414(b).

The United States Supreme Court explained the nature of a check in *Williams v. United States,* 458 U.S. 279, 284–85, 102 S.Ct. 3088, 3091–92, 73 L.Ed.2d 767 (1982), a case involving a criminal prosecution under 18 U.S.C. § 1014 for check kiting. In the Court's analysis, "a check is simply a draft drawn on a bank and payable on demand which contains an unconditional . . . order to pay a sum certain in money." [12] *Id.* (internal citations and quotations omitted).

The defendant in *Williams* had deposited several checks that were not supported by sufficient funds. Under § 1014, the prosecution was required to show that the defendant knowingly and wilfully made a false statement of material fact in obtaining credit from the bank. Depositing checks that were not supported by sufficient funds, the Court explained, did not involve making a "false statement" at all because, "a check is literally not a 'statement' at all." *Id.*

It is notable that the government argued in *Williams,* and the dissenting justices opined, that in issuing a check, "a drawer impliedly represents that he has on deposit with the drawee bank funds equivalent to the face amount of the check." 458 U.S. at 296, 102 S.Ct. 3088, (dissenting opinion of

Justice Marshall) (quotations omitted). The Supreme Court rejected this analysis and found that delivery of a check involves no representation. *See id.* at 285–86, 102 S.Ct. 3088.

Business transactions frequently involve statements. However, these statements are found elsewhere in a business transaction, and not in the check.

## IV. Admissibility of Markers

At the trial, plaintiff moved for the admission into evidence of three markers allegedly signed by debtor, two in the amount of $10,000 each and one in the amount of $20,000. Plaintiff sought admission of the markers through the business records exception to the hearsay rule. *See* FED. R. EVID. 803(6). Markers are not admissible under this rule because a negotiable instrument is not admissible as a business record (except in circumstances not relevant in this case). *See Remington Investments, Inc. v. Hamedani,* 55 Cal. App.4th 1033, 1042, 64 Cal.Rptr.2d 376, 382 (Ct.App.1997). However, it is not necessary to invoke the business record exception to the hearsay rule for the admission into evidence of a check or other negotiable instrument. As the Ninth Circuit recently explained, checks are legally-operative verbal acts that are not barred by the hearsay rule. *United States v. Pang,* 362 F.3d 1187, 1192 (9th Cir.2004)

The markers, however, must be properly authenticated in order to be admitted into evidence. *See* FED. R. EVID. 901. As a negotiable instrument or commercial paper, a check is self-authenticating. *Pang,* 362 F.3d at 1192; *United States v. Hawkins,* 905 F.2d 1489, 1493 (11th Cir.1990). Rule 902 of the Federal

---

**12.** The court has elided out the language, now contained in UCC § 3–104(a), referring to a "promise . . . to pay a fixed amount . . . ." The "promise" language refers to promissory notes, not checks (or other drafts), and is not relevant here or in *Williams.*

Rules of Evidence provides in relevant part:

**Rule 902. Self Authentication.** Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

. . .

(9) **Commercial paper and related documents.** Commercial paper, signatures thereon, and documents related thereto to the extent provided by general commercial law.

▮ The general commercial law to which Rule 902(9) refers is the UCC. *See id.* note to paragraph (9) (1974 Enactment). With respect to negotiable instruments, UCC § 3–308(a) provides in relevant part: "the authenticity of . . . each signature on the instrument is admitted unless specifically denied in the pleadings." This section creates a presumption that commercial paper offered in evidence is authentic and dispenses with a requirement of extrinsic evidence for admissibility. *See, e.g., United States v. Carriger,* 592 F.2d 312, 316 (6th Cir.1979).

The answer filed by Miller in this adversary proceeding is a general denial (except for admitting that this is a core proceeding), and thus does not specifically deny the authenticity of the signatures on the markers. Accordingly, the signature of the debtor on each marker at issue is presumed authentic, and this presumption is unrebutted. Plaintiff was not required to present any additional extrinsic evidence to authenticate the markers, and they are admitted into evidence.[13]

## V. The § 523(a)(2)(A) Claim

▮ The central purpose of the bankruptcy code, according to the Supreme Court, is to permit insolvent debtors to reorder their affairs, make peace with their creditors and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt. *See Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991)(quotations omitted). The bankruptcy discharge provides this fresh start. In consequence, any exceptions to the discharge must be construed narrowly in favor of the debtor. *See, e.g., Su v. Carrillo (In re Su),* 259 B.R. 909, 912 (9th Cir. BAP 2001), *aff'd* 290 F.3d 1140 (9th Cir.2002); *Snoke v. Riso (In re Riso),* 978 F.2d 1151, 1154 (9th Cir.1992). However, to maintain the integrity of the bankruptcy process, a discharge must be limited to the honest but unfortunate debtor. *See, e.g., Grogan,* 498 U.S. at 286–87, 111 S.Ct. 654.

Section 523(a)(2)(A), which provides the fraud exception to the bankruptcy discharge, states in relevant part:

A discharge under section 727 . . . does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

The complaint in this case alleges that the debt here at issue is nondischargeable on the grounds that the debtor obtained money by false pretenses, a false representation and actual fraud. We consider first the actual fraud claim.

---

**13.** Each of the markers here at issue has "COUNTERFEIT" stamped on the front, which is then crossed out. Because Mandalay offered no evidence to explain these crossed-out marks, the court gives them no weight.

## A. Actual Fraud

■ The usual basis of objection for nondischargeability under § 523(a)(2)(A) is that the debt was incurred through actual fraud. In the Ninth Circuit, a creditor who seeks to establish a debt's nondischargeability due to actual fraud is required to show that:

(1) the debtor made a representation;

(2) at the time debtor knew the representation was false;

(3) debtor made the representation with the intention and purpose of deceiving the creditor;

(4) the creditor justifiably relied on the representation;

(5) the creditor sustained damage as the proximate result of the representation's having been made.

See, e.g., Citibank (South Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1086 (9th Cir.1996); Britton v. Price (In re Britton), 950 F.2d 602, 604 (9th Cir.1991). These requirements mirror the common law elements of fraud. See, e.g., American Express Travel Related Services Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir.1996); Eashai, 87 F.3d at 1087; see also Field v. Mans, 516 U.S. 59, 69, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995) ("[w]here Congress uses terms that have accumulated settled meaning under … the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of those terms.")

### i. False Representation

The first and second requirements for establishing actual fraud require the plaintiff to show that the debtor made a representation that he knew was false when made. To prevail on a claim for actual fraud, Mandalay must show that Miller made an untrue or false statement of fact when issuing his markers in exchange for casino chips.

Mandalay has offered no evidence of anything Miller said or wrote when obtaining his markers. Mandalay offers only the markers themselves, the legal equivalent of checks.

■ As elaborated above, the United States Supreme Court held in Williams that the presentation of a check does not involve the making of a "false statement" at all. While Williams was a criminal case for check kiting, the analysis of the law of checks given by the majority in that case is no different in the § 523(a)(2) context. Under the Supreme Court's reasoning in Williams, the presentation of a marker, just like a check, does not involve the making of a false statement.

■ Therefore, Miller did not make a false statement or representation by delivering the markers to Mandalay. See Mega Marts, Inc. v. Trevisan (In re Trevisan), 300 B.R. 708, 716–17 (Bankr.E.D.Wis. 2003); Microtech International, Inc. v. Horwitz (In re Horwitz), 100 B.R. 395, 398 (Bankr.N.D.Ill.1989)("[d]ebtor's issuance of checks to plaintiffs, without more, does not constitute a false representation within the meaning of Bankruptcy Code Section 523(a)(2)(A)").

The delivery of a check is typically a part of a larger transaction in which a debtor makes representations that may be false. However, Mandalay has failed to show any representation that Miller made apart from the delivery of the markers here at issue.

### ii. Implied Representation

■ Mandalay argues that the act of tendering a check constitutes an implied representation that the check is good, and that there are sufficient funds in the ac-

count to cover the checks.[14] *See Bear Stearns v. Kurdoghlian*, 30 B.R. 500, 502 (9th Cir. BAP 1983).[15] However, the court finds that *Kurdoghlian* is no longer good law. Prior to 1990, UCC § 3–413(2) provided: "[t]he drawer *engages* that upon dishonor of the draft … he will pay the amount of the draft to the holder" (emphasis added). The "engages" language could be interpreted to imply a representation that would be false when made if the drawer delivered a bad check that the drawer did not intend to pay.

However, this "engages" language was deleted in the 1990 revisions to Article 3. The UCC now provides only that, if an unaccepted check is dishonored by the bank, the drawer is *obliged* to pay it according to its terms at the time it was issued. *See id.* § 3–414(b). The obligation now is simply statutory and involves no representation, promise or engagement at all. Delivering a check or marker simply does not constitute a representation, according to the applicable statute and Supreme Court case law. In consequence, in this court's view, UCC § 3–414(b) can no longer support a claim of a false representation in connection with a bad check.

*Kurdoghlian* does not apply in this case for a second reason. On August 28, 2000

Miller had more than sufficient funds to cover the markers in the bank account on which the markers were drawn. Thus, even if he impliedly represented that his bank account had sufficient funds to cover the markers, this representation was true.

The theory that issuing a check (or a marker) includes an implicit representation that the check is good (or any other representation) has an additional infirmity. Insofar as the markers here at issue include implied representations, they would not be admissible in evidence. The court has admitted the markers (see *supra*) only because they are verbal acts, and not hearsay. If the markers included implied representations, on the other hand, they would constitute hearsay and would require an exception to the hearsay rule to permit their admission into evidence. As this court ruled at trial in this case, Mandalay failed to show that the markers qualified for any exception to the hearsay rule. Thus the markers would not be before the court at all for the purpose of any implied representation.

### iii. Non–Disclosure

■■■■■ In addition to actual misrepresentations, Mandalay contends in its clos-

---

14. Some courts have found that, when a debtor presents a check (or marker), the debtor makes an implied *promise* to pay the face amount of the check in the event the bank dishonors the check. A promise of future performance or intention is generally not actionable as fraud at common law. However, if, at the time a promise is made, the debtor does not actually intend to honor the promise, this lack of intention supports a fraud claim. *See, e.g., Desert Palace, Inc. v. Baumblit (In re Baumblit)*, 229 B.R. 50, 62 (Bankr.E.D.N.Y. 1999), *aff'd in part, rev'd in part on other grounds*, 251 B.R. 442 (E.D.N.Y.2000); *Boyd Gaming Corp. v. Hall (In re Hall)*, 228 B.R. 483, 489 (Bankr.M.D.Ga.1998). *See also* RESTATEMENT (SECOND) OF TORTS (1976) § 530(1) (a representation of the maker's own intention to do or not to do a particular thing is fraudu-

lent if he does not have that intention). Mandalay does not rely on this argument.

15. Although the *Kurdoghlian* opinion was issued nearly nine months after the Supreme Court found in *Williams* that the issuance of a check is not a representation at all, the court in *Kurdoghlian* ignored altogether the *Williams* decision and analysis. As a California bankruptcy court stated soon after *Kurdoghlian* was issued, "it is difficult to reconcile the language of the Appellate Panel's opinion with this Court's understanding of the prevailing law on this question, particularly in consideration of the … [*Williams*] decision …." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Younesi (In re Younesi)*, 34 B.R. 828, 830–31 (Bankr.C.D.Cal.1983).

ing brief that Miller defrauded it through the non-disclosure of material facts. The concealment or omission of material facts that a party has a duty to disclose can support the nondischargeability of a debt on the grounds of actual fraud. *See, e.g., Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte),* 96 F.3d 1319, 1323—24 (9th Cir. 1996); *Kukulka–Stone v. Ekrem (In re Ekrem),* 192 B.R. 982, 992 (Bankr.C.D.Cal. 1996). A concealed fact is material if "a reasonable man would attach importance to the alleged omissions in determining his course of action." *Loomas v. Evans (In re Evans),* 181 B.R. 508, 515 (Bankr.S.D.Cal. 1995) (quotations omitted).

The most important defect in Mandalay's non-disclosure argument is that the complaint is entirely lacking in any allegations of non-disclosure of material facts. In consequence, no such claims are before the court.

Furthermore, there is no evidence to support Mandalay's non-disclosure claims. In its closing brief, Mandalay argues that Miller failed to disclose that he was in the process of closing his Wells Fargo bank account when he delivered the markers in late August, 2000. However, no evidence on this issue was admitted at trial.[16] Mandalay's claim that Miller failed to disclose that he had little income is equally unavailing: no evidence has been admitted on Miller's income in 2000.

Thus Mandalay has failed to make a prima facie case that Miller defrauded it through the non-disclosure of material facts.

#### iv. Intent to Deceive

 The third element of a cause of action for actual fraud that Mandalay must show is Miller's intent to deceive it through a false representation. Intent to deceive is often difficult to show. As one court has said, "[r]are indeed is the case in which the debtor broadcasts his intent to friends and neighbors, or writes a letter to his mother confessing the details of his plot to defraud his creditors." *Chevy Chase Bank v. Briese (In re Briese),* 196 B.R. 440, 451 (Bankr.W.D.Wis.1996). The fact-finder must consider all of the facts and circumstances of the case to determine if the debtor lacked the requisite intent to perform. *See, e.g., Briese,* 196 B.R. at 452.

 For actual fraud, the false representation (whether express or implied) must be the vehicle for the deceit. A free-standing intent to deceive does not support this element. Mandalay cannot prevail with a showing only that Miller intended in general to deceive it into lending him money on markers (or checks) that subsequently were dishonored. Mandalay must show that Miller intended to deceive it through his false representations. In this case Mandalay has not shown any false representation by Miller that he made to Mandalay with intent to deceive it. Thus there is no vehicle to carry an intent to deceive, and this element cannot be satisfied.[17]

---

**16.** At trial, the court denied the admission of the only evidence which would have supported a finding that Miller was in the process of closing the account several weeks later.

**17.** It could be argued (although Mandalay does not make this argument) that the relevant intent is Miller's intent (or lack thereof) to perform his statutory obligation under UCC § 3–414(b) to pay the check according to its terms at the time it was issued, in case it was dishonored by his bank. The argument would continue that Miller intended to defraud Mandalay by intending not to satisfy this legal requirement.

However, this is not a fraud argument. There is no representation (not even an implied representation) that can carry the corrupt intent. This intent would be relevant for a § 523(a)(6) claim, but not one under § 523(a)(2)(A) (see *infra*).

■ Furthermore, even if such a vehicle existed, the court cannot find that Miller intended to deceive Mandalay. The evidence does not support a finding that Miller lacked the intent to pay at the time he delivered the markers to Mandalay. Only Miller's intent at that moment is relevant to a fraud claim. *See, e.g., Desert Palace, Inc. v. Baumblit (In re Baumblit)*, 229 B.R. 50, 62 (Bankr.E.D.N.Y.1999). After hearing the testimony of Mandalay's witness and evaluating his credibility, and examining the documents admitted into evidence in this adversary proceeding, the court finds that, at the time Miller issued the markers here at issue to Mandalay, he *did* intend to pay.

■ Perhaps the best indication of Miller's honest intent is that he actually paid $19,000 of the debt here at issue, over a period of nine months after incurring the debt. It is quite unlikely that he would have paid this much to Mandalay over such a long period of time if, when incurring the debt on August 26 and 28, he intended not to repay the debt. As another court found when the debtor made substantial payments after incurring the debt, "[t]his conduct totally belies the proposition that [the debtor] never intended to repay this loan." *Kiester v. Everman (In re Everman)*, 72 B.R. 687, 691 (Bankr. M.D.Fla.1987) (debtor made eighteen payments after notes at issue were signed). A debtor's ultimate inability to pay a debt is

not relevant to ascertaining fraudulent intent. *See Baumblit*, 229 B.R. at 62.

Mandalay contends that the evidence showing that Miller owed $60,000 to two other casinos on August 26, 2000 and August 29, 2000 is an indication of his intent not to repay. In credit card fraud cases, the Ninth Circuit has adopted a non-exclusive list of twelve factors to consider when determining whether a debtor intends to repay a credit card debt. *See Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1284–86 (9th Cir.1996).[18] These factors are nonexclusive, none is dispositive, nor must a debtor's conduct satisfy a minimum number in order to prove fraudulent intent. *See Household Credit Services, Inc. v. Ettell (In re Ettell)*, 188 F.3d 1141. 1144 (9th Cir.1999); *American Express Travel Related Services Co. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir.1996). While Mandalay's evidence is relevant to one of the twelve factors, on balance it is insufficient to carry the day in this case, especially in view of Miller's payments over the ensuing nine months.

In addition, Miller apparently had the ability as well as the intent to pay Mandalay. He had more than sufficient funds in his bank accounts at the time he issued the markers in exchange for gambling chips. Mandalay's own records show that he had more than $100,000 in his bank account at Wells Fargo on August 28, 2000, the date that he issued the last two markers.[19]

---

**18.** The twelve factors are: (1) the length of time between the charges made and the filing of bankruptcy; (2) Whether or not an attorney has been consulted concerning the filing bankruptcy before the charges were made; (3) the number of charges made; (4) the amount of the charges; (5) the financial condition of the debtor at the time the charges are made; (6) whether the charges were above the credit limit of the account; (7) did the debtor make multiple charges on the same day; (8) whether or not the debtor was em-

ployed; (9) the debtor's prospects for employment; (10) financial sophistication of the debtor; (11) whether there was a sudden change in the debtor's buying habits; and (12) whether the purchases were made for luxuries or necessities. *See Anastas*, 94 F.3d at 1284 n. 1.

**19.** Mandalay has presented no separate evidence of the state of Miller's bank accounts on August 26, 2000.

There is no evidence whatever that he was in a "dire financial situation," as Mandalay alleges without evidentiary support in its closing brief.

■ Even if Miller were in such a situation, "[c]are must be taken to stop short of a rule that would make every desperate, financially strapped debtor a guarantor of his ability to repay, on pain of nondischargeability." *Karelin v. Bank of American NTSA (In re Karelin)*, 109 B.R. 943, 947 (9th Cir. BAP 1990). The court in *Karelin* noted that a substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight. "This," the court said, "by itself does not constitute fraudulent conduct warranting non-discharge." *Id.* at 948.

Finally, this is not a case where the debtor incurred the debt on the "eve of bankruptcy," expecting to receive a discharge of the debt. *See First National Bank v. Wright (In re Wright)*, 8 B.R. 625, 628 (Bankr.S.D.Ohio 1981). It was almost fourteen months later that Miller filed his bankruptcy petition. This case contrasts starkly with *Trump Castle Associates v. Poskanzer (In re Poskanzer)*, 143 B.R. 991, 997 (Bankr.D.N.J.1992), cited by Mandalay in its closing brief, where the debtor received more than $875,000 in credit from various casinos less than 30 days before filing his bankruptcy petition. *See also Boyd Gaming Corp. v. Hall (In re Hall)*, 228 B.R. 483, 489–90 (Bankr.M.D.Ga.1998) (finding marker debt dischargeable despite filing of bankruptcy case ten days later).

Mandalay has failed to show that Miller intended to deceive it through a false representation. Thus, plaintiff's claim of actual fraud under § 523(a)(2)(A) fails on this ground as well.

### v. Justifiable Reliance

■ Even if Miller made false representations in connection with issuing the markers with the intent to deceive it, the evidence is insufficient to show that Mandalay justifiably relied on the representations. *See Field v. Mans*, 516 U.S. 59, 70—71, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995). The Ninth Circuit has explained the meaning of justifiable reliance:

> The general rule is that a person may justifiably rely on a representation even if the falsity of the representation could have been ascertained upon investigation. In other words, negligence in failing to discover an intentional misrepresentation is no defense. However, a person cannot rely on a representation if he knows that it is false or its falsity is obvious to him. In sum, although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth.

*Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1090–91 (9th Cir.1996) (quotations omitted). Whether a creditor has justifiably relied on representations made by the debtor is determined on a case by case basis. *Field*, 516 U.S. at 71, 116 S.Ct. 437.

■ The *Eashai* court further explained.

> If the creditor had warning that the debtor's account was in danger of default, the creditor will not be able to establish justifiable reliance. We will not allow a creditor, who has been put on notice of the debtor's intent not to repay, to extend credit and then later claim nondischargeability on the basis of fraud.

87 F.3d at 1091. Therefore, justifiable reliance does not exist where a creditor ignores red flags that show up when it

makes a credit check before granting credit. *See, e.g., Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir.1996).

■ In this case the red flags showed up on August 26, 2000, the date of the first marker here at issue. Mandalay learned on that day, pursuant to its Central Credit check, that Miller's debt to Las Vegas casinos had ballooned from $2000 (the amount owing at the time of his most recent gambling trip) to $60,000. Mandalay also learned that $10,000 of this debt, owing to Bellagio, was overdue. *Cf. Boyd Gaming Corp. v. Hall (In re Hall)*, 228 B.R. 483, 491 (Bankr.M.D.Ga.1998) (finding no justifiable reliance on $14,000 in gambling markers where debtor was late in paying $23,000 in outstanding markers from a gambling session a month earlier and casino failed to discover $50,000 in debt outstanding to other area casinos). Notwithstanding this adverse credit development, Mandalay extended Miller $50,000 in credit, more than it had ever granted him before.

Mandalay was not entirely reckless in granting this credit on August 26. Mandalay also learned that Miller had sufficient funds on deposit in his Wells Fargo account to cover both the outstanding debt to the other casinos and the new credit that Mandalay extended. However, on balance the court finds that Mandalay's reliance on Miller's markers, and whatever they may have implied for fraud purposes, was not justifiable in the circumstances of this case.

## vi. Damages

■ According to the account record admitted at trial, Miller borrowed $50,000 from Mandalay in August, 2000 and repaid $19,000. However, Mandalay has only offered in evidence markers totaling $40,000. Mandalay contends that the $31,000 balance is all nondischargeable. However, this raises an accounting issue that Mandalay has failed to address: why should the payment be credited in part to the $10,000 for which no marker has been proved? Apparently Mandalay has allocated $10,000 of the payments to this $10,000 marker that has not been offered in evidence.

The allocation of the first $10,000 payment to the first $10,000 marker would be appropriate under a FIFO (first in first out) allocation rule. However, Mandalay has offered no justification for applying such a rule. In the absence of any such proof, the court is required to apply the principle that the nondischargeability provisions are strictly construed against an objecting creditor and in favor of the debtor. *See Su v. Carrillo (In re Su)*, 259 B.R. 909, 912 (9th Cir. BAP 2001), *aff'd* 290 F.3d 1140 (9th Cir.2002); *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir.1992). Under this rule, the $19,000 in payments must be applied against the $40,000 in markers that have been proved, which leaves only a $21,000 debt at issue in this dischargeability proceeding.

## B. False Representation and False Pretenses

■ Having found that Miller did not obtain funds from Mandalay by actual fraud, we turn now to the other language in § 523(a)(2)(A). Mandalay contends that it is entitled to have the debt declared nondischargeable because it was incurred by false pretenses.

In using the phrase, "false pretenses, a false representation, or actual fraud," it is easy to conclude that Congress intended to specify three different grounds on which to deny the discharge of a debt. *See, e.g., Farraj v. Soliz (In re Soliz)*, 201 B.R. 363, 369 (Bankr.S.D.N.Y.1996) (finding that the discharge of a debt may be denied on any

of these three grounds). In contrast, many of the reported § 523(a)(2)(A) decisions do not distinguish between false representations and false pretenses because it is difficult to state clearly how the two concepts differ. As one court noted, "The conceptual difficulty attending such a fine differentiation ... leads courts to typically ignore the negligible difference between the two phrases." *Shannon v. Russell (In re Russell)*, 203 B.R. 303, 312 (Bankr. S.D.Cal.1996).

The history of the use of these terms in United States bankruptcy law is curious. The Bankruptcy Act of 1800 had no provision for the denial of a discharge, either in whole or in part, on the grounds of fraud.[20] This concept first appeared in the Bankruptcy Act of 1841, which provided, "if any ... bankrupt shall be guilty of any fraud ... he shall not be entitled to any [bankruptcy] discharge ...."[21]

The Bankruptcy Act of 1867 changed the approach to a debt created by fraud. This law provided that, "no debt created by the fraud ... of the bankrupt ... shall be discharged under this act ...."[22] Instead of denying a discharge altogether if the debtor had incurred a debt through fraud (and permitting all creditors to engage in collection efforts after the conclusion of the bankruptcy case), this statute limited the effect of the fraud to the nondischargeability of the debt at issue.

The provision on this issue in the original version of the Bankruptcy Act of 1898 was similar to that in the 1867 Act. Section 17(2) stated: "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as ... are judgments in actions for frauds, or obtaining property by false pretenses or false representations ...."[23] The "false pretenses or false representations" language was new to this statute. It is not clear what (if anything) it added to the nondischargeability of a fraud judgment.

In 1903 Congress deleted the requirement that a creditor have a judgment (based on fraud, false pretenses or false representations) for such a debt to be nondischargeable. The purpose of this amendment was "in the interest of justice and honest dealing and honest conduct,"[24] and was intended "to exclude beyond peradventure certain liabilities growing out of offenses against good morals."[25] At the same time that Congress deleted the judgment requirement, it deleted the "fraud" term from § 17(2). Perhaps this was done by mistake: the legislative history gives no further clue as to the reason for this deletion.

From 1903 until the present bankruptcy code took effect in late 1979, the only fraud exception to nondischargeability had to come under the "false pretenses or false representations" language remaining in § 17(a)(2) after the 1903 amendment. Nonetheless, over the ensuing 75 years the courts generally applied the "false pre-

20. *See* An Act to establish an uniform System of Bankruptcy throughout the United States, ch. 19, 2 Stat. 19 (1800)(repealed 1803).

21. *See* An Act to establish a uniform system of bankruptcy throughout the United States, ch. 9, § 4, 5 Stat. 440 (1841)(repealed 1843).

22. *See* An Act to establish a uniform System of Bankruptcy throughout the United States, ch. 176, § 33, 14 Stat. 517 (1867)(repealed 1878).

23. *See* An Act to establish a uniform system of bankruptcy throughout the United States, ch. 541, § 17(2), 30 Stat. 544 (1898)(repealed 1978).

24. H.R. REP. NO. 57–1698, at 3 (1902).

25. *Id.*, at 6.

tenses or false representation" language as if it was synonymous with fraud.

The Ninth Circuit cases at the end of the career of the 1898 Act are illustrative. On at least three occasions the court held generally that the § 17(a)(2) language (which also included a provision on false financial statements) required proof of the five traditional elements of common law fraud as stated *supra*. *See Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 655 (9th Cir.1978); *California State Employees' Credit Union No. 6 v. Nelson (In re Nelson)*, 561 F.2d 1342, 1346 (9th Cir.1977) (false financial statement); *Public Finance Corp. of Redlands v. Taylor (In re Taylor)*, 514 F.2d 1370, 1373 (9th Cir.1975) (same). The court in *Taylor* added that § 17(a)(2) required a proof of "actual or positive fraud, not merely fraud implied by law." *See* 514 F.2d at 1373. Such fraud, the court stated, "is the type involving moral turpitude or intentional wrong, and thus there can be no mere imputation of bad faith." *Id.*

During the entire duration of the 1898 Bankruptcy Act, the courts generally gave no meaning to the "false pretenses" portion of the statutory language that was different from common law fraud. *See generally* the last and definitive commentary on the 1898 Bankruptcy Act, 1A COLLIER ON BANKRUPTCY ¶ 17.16[3] (James Wm. Moore, ed., 1978).[26]

In enacting the Bankruptcy Code in 1978 (and § 523(a)(2)(A) thereof), Congress added "actual fraud" as a ground for

the nondischargeability of a debt. In the legislative history, Congress explained that the entire phrase, "false pretenses, a false representation, or actual fraud" was "intended to codify current case law e.g., *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586 (1877) [applying fraud provision of 1867 Act], which interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law." 124 Cong. Rec. H11,095–6 (daily ed. Sept. 28, 1978); 124 Cong. Rec. S17,412 (daily ed. Oct. 6, 1978).

In § 523(a)(2)(A) Congress also brought forward from the 1898 Act the terms "false pretenses" and "false representation." The meaning of these terms in the 1898 Act, as interpreted by court decisions, thus carried over into § 523(a)(2)(A). *See Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995) ("[w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of those terms."). Therefore, in interpreting this language, this court is bound by the meaning given to these terms in the Ninth Circuit case law, that "false pretenses" and "false representations" are equivalent to actual fraud.

Thus the court concludes that, under Ninth Circuit law, the terms "false pretenses" and "false representation" have the same meaning in § 523(a)(2)(A) as the term "actual fraud."[27] In consequence,

---

**26.** The only hint of such a distinction is found in Collier's final paragraph of footnote 12 to ¶ 17.16[3].

**27.** *Accord: Thorp Credit & Thrift Co. v. Pommerer (In re Pommerer)*, 10 B.R. 935, 938–39 (Bankr.D.Minn.1981). *Contra: RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292–93 (5th Cir.1995) ("we have distinguished between actual fraud on the one hand, and false pretenses and representations on the other.");

*Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 260–61 (Bankr.S.D.N.Y.2000); *Farraj v. Soliz (In re Soliz)*, 201 B.R. 363, 369 (Bankr.S.D.N.Y.1996); *Check Control v. Anderson (In re Anderson)*, 181 B.R. 943, 951 (Bankr.D.Minn.1995), *Bombardier Capital, Inc. v. Baietti (In re Baietti)*, 189 B.R. 549, 554 (Bankr.D.Maine 1995).

they cannot provide a basis, independent of actual fraud, for finding a debt nondischargeable.[28]

## VI. Willful and Malicious Injury

■ The court has no doubt that, in an appropriate case, passing a bad check can create a debt that is not dischargeable in bankruptcy. According to the foregoing analysis, such a claim does not lie under § 523(a)(2) without evidence that the underlying transaction involves traditional actual fraud or deceit. A bad check, standing alone, cannot support such a case.

■ Section 523(a)(6), which makes nondischargeable a debt for willful and malicious injury, would apply to a bad check in an appropriate case. *See, e.g., Desert Palace, Inc. v. Baumblit (In re Baumblit)*, 229 B.R. 50, 63–64 (Bankr. E.D.N.Y.1999). To make such a case, Mandalay would have to prove that Miller delivered the markers here at issue with the intent to harm it by failing to repay the credit extended. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998); *see also Baumblit*, 229 B.R. at 64.

However, Mandalay has made no effort to prove such a case. Furthermore, such a claim would likely falter on the same intent issues that prevent Mandalay from prevailing on its § 523(a)(2)(A) claim. The evidence before the court would be insufficient to make this proof.[29]

## VII. Conclusion

The court concludes that § 523(a)(2)(A) does not support the denial of a discharge of a debt based on a bad check, absent further proof of the underlying transaction. The court finds that a bad check, standing alone, cannot support a claim for actual fraud. The court further finds that, under Ninth Circuit law, the "false pretenses" and "false representations" language of § 523(a)(2)(A) has the same meaning as actual fraud, and cannot provide an independent basis for finding nondischargeable the debt here at issue.

In addition, after trial as to the particular facts and circumstances of this case, the court finds that the plaintiff has not shown that the debt was induced by false pretenses, a false representation, or actual fraud. The court finds that debtor made no false representation to plaintiff, whether explicit or implicit, that he had no intent to deceive plaintiff, and that any reliance by plaintiff was not justified under the circumstances of this case. The court further finds that Miller did not intend to injure Mandalay by failing or refusing to pay the debt arising from the unpaid portion of the markers. Miller made substantial payments on the debt over a period of nine months after incurring the debt at issue, and did not file this bankruptcy case until nearly fifteen months after issuing

---

**28.** The only discovered case published in the Ninth Circuit to the contrary is *Griffin v. Felton (In re Felton)*, 197 B.R. 881 (N.D.Cal. 1996), where the district court sustained a bankruptcy court finding that a debt was nondischargeable under § 523(a)(2)(A), in part on the theory of false pretenses. The debtor had persuaded the plaintiff, a nearly illiterate 69–year–old woman with failing eyesight, to co-sign on a mortgage for her son and daughter-in-law, and to mortgage her own house in support of the debt. The district court found that the debtor's conduct in that case con-

veyed a false impression about the consequences and risks of the loan at issue, which was nondischargeable as a false pretense. However, the facts found by the court supported a finding of actual fraud based on misrepresentations by the debtor to the mother.

**29.** Mandalay would have to prove the other elements of a claim under § 523(a)(6) as well. See *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146–47 (9th Cir.2002).

the markers. Thus this debt is dischargeable.